STOCKER HINGE MFG. CO., Plaintiff-Appellant, *v.* DARNEL INDUSTRIES, INC., *et al.*, Defendants-Appellees.

First District (1st Division)    No. 78-8

Opinion filed June 5, 1978.—Rehearing denied July 10, 1978.

Thomas Campbell, Edward B. Hirshfeld, and James D. Parsons, all of Chicago (Gardner, Carton & Douglas, of counsel), for appellant.

Merwin R. Burman and Ronald R. Rassin, both of Chicago (Fink, Coff and Stern, of counsel), for appellees Samuel A. Hoffman and Darnel Industries, Inc.

Milton K. Joseph, of Rosemont, for appellee S & S Hinge Company.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

In this interlocutory appeal, Stocker Hinge Mfg. Co. (plaintiff), seeks to reverse an order denying plaintiff a preliminary injunction against defendants Darnel Industries, Inc. (Darnel), Samuel A. Hoffman (Hoffman) and S & S Hinge Company (S & S).

In its brief, plaintiff urges that the trial judge erred in holding an employment contract between plaintiff and Hoffman void on the ground

that its noncompetition provision was too broad; the trial court erred in failing to find that a provision in the employment agreement for preservation of trade secrets was valid and enforceable; the trial court failed to recognize and enforce the common law duty of defendants not to misuse trade secrets; since plaintiff had established a fair likelihood of success on the merits, irreparable harm and absence of an adequate legal remedy, the trial court should have granted the preliminary injunction and the trial court also erred in denying discovery to plaintiff and in limiting plaintiff's right to counsel.

In their brief, Darnel and Hoffman maintain that plaintiff failed to show a reasonable likelihood of prevailing on the merits because the equities do not lie with plaintiff; alleged trade secrets were not communicated to Hoffman as a result of a confidential relationship between him and plaintiff; plaintiff failed to establish any trade secret and plaintiff has been adequately compensated for any loss. Said defendants also urge that plaintiff failed to establish it had no adequate remedy at law or that it would be irreparably injured; plaintiff came into court with unclean hands; the noncompetition provision in the employment contract and the provision therein regarding trade secrets are void; the rulings of the trial court regulating discovery were proper and plaintiff, in fact, was given a full and fair opportunity to be heard.

In a separate brief, defendant S & S contends that plaintiff has no contractual relationship with S & S and that plaintiff failed to show affirmatively that S & S acquired its dies and designs with knowledge of any breach of contract or breach of confidential relationship between Hoffman or Darnel and plaintiff and plaintiff has failed to establish a fair likelihood that it would prevail on the merits against S & S so that the trial court properly denied plaintiff's motion for preliminary injunction.

We will first consider the written noncompetition agreement between Stocker and Hoffman dated January 11, 1966. In this agreement, Hoffman covenanted that neither during his employment nor at any time thereafter would he give to or knowingly permit acquisition through him by any third person "of any confidential or other information relating to the business, assets, accounts, processes or 'trade secrets' of the employer, of which knowledge shall have come to the employee [Hoffman] as a result of or in connection with his employment." The agreement also provided that for two years after the termination of employment neither Hoffman nor any firm or business over which he had control would directly or indirectly compete with the business of Stocker in nine specified States of the United States.

Plaintiff, Hoffman and Darnel have made lengthy arguments with reference to the last mentioned covenant of the contract regarding competition by Hoffman with plaintiff. In our opinion, this portion of the

contract is not material to this appeal. It is undisputed that the activities of Hoffman, which plaintiff seeks to enjoin, did not take place until after the expiration of the 2-year period following the date of termination of Hoffman's employment with Stocker. In our view, the issue here is whether there was a violation of the remaining portion of the agreement regarding trade secrets. In addition, even without this agreement, there is an issue as to whether Hoffman obtained and is now violating the rights of plaintiff with reference to basic trade secrets which are the property of plaintiff.

In other words, if plaintiff is actually the owner or possessor of trade secrets which it imparted to Hoffman pursuant to a confidential relationship while he was employed by plaintiff, the wrongful use of this information may be enjoined by plaintiff particularly if Hoffman has specifically covenanted not to do so. (See *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 547-48, 132 N.E. 806.) Therefore, in our opinion, the decisive issue to be determined here is whether plaintiff has possession and uses in its business a trade secret which is defined as " 'a plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it.' " (*Victor*, 299 Ill. 532, 545-46, quoting from 22 Cyc. L. & Proc. 842.) Determination of this matter requires a factual statement.

The plaintiff specializes in the manufacture of long, narrow "continuous" hinges, such as those on the lids of pianos, and "butt" hinges, a short and square hinge used on cabinets and doors. Defendant Hoffman is an experienced tool and die maker who was employed as chief engineer by plaintiff from January 1966 until January 1974. Hoffman participated in the design of carbide tools and dies used by plaintiff in the production of its hinges. Prior to his association with plaintiff, Hoffman worked from 1951 to 1966 as a tool and die maker for Portage Tool Company, an establishment which produced carbide tools and dies for various manufacturers including plaintiff. When Hoffman left plaintiff, he became associated with defendant Darnel, another tool and die producer. Hoffman performed die building services for Darnel which is owned by Hoffman's son-in-law.

In December of 1976, Hoffman approached defendant S & S with the suggestion that S & S, a hinge manufacturer and competitor of plaintiff, replace its existing steel dies with carbide dies manufactured by Darnel. In the spring of 1977, S & S ordered several carbide dies from Darnel. It is this last business arrangement which has provoked the instant controversy.

Plaintiff contends Hoffman incorporated into the design and manufacture of these carbide dies various trade secrets, developed during his years of employment by plaintiff. Specifically, plaintiff claims that its

machines contain certain unique processes and features resulting in the automated production of continuous hinges virtually without a residue of scrap material. These allegedly unique features include: the ability to cut the material which forms the hinge with a blade less than half as thick as the material; the production of hinges three times as quickly as S & S; the use of three dies in one punch press and the incorporation of several custom-made parts into the dies and press.

In support of these contentions, extensive testimony was given H. Edwin Stocker, Jr., who has been associated with plaintiff for more than 30 years and is currently its president. Mr. Stocker's testimony was presented to the court in closed sessions. The defense followed with rebuttal by Hoffman; Warren Meyers (Meyers), chief engineer at S & S and holder of an engineering degree; and Edward Sperling (Sperling), tool engineering manager of a steel company who has been involved in the tool and die field since 1927. We will first summarize Mr. Stocker's analysis regarding the alleged secret features of each of the above listed items and then the responses of defendants' expert witnesses.

Mr. Stocker testified plaintiff's machinery is unique in that its cutting blades are generally only 55 to 60 percent as thick as the material fed into the press and at times carbide punch blades only .022 inches thick are used to cut material ranging in thickness from .041 to .045 inches. In contrast, defendants' expert witness, Sperling, stated his company's thinnest blades were .044 inches thick, twice as thick as plaintiff's blades, and that if plaintiff used a .020 blade to cut .050 material it would be unique. However, Hoffman testified that according to his knowledge plaintiff uses blades of .036 thickness to cut material of .050 thickness and that neither plaintiff nor any other hinge maker uses .020 blades to cut .050 material.

Mr. Stocker also stated it is unique to use three dies in one punch press as ordinarily only one die is used in each press. He added that this feature eliminated the need for three separate presses to make the completed hinges. The witness explained the manner in which a strip of steel is fed into the press and travels through three dies before exiting as a completed and assembled hinge. Defendants offered in evidence a brochure from another company which illustrated the ability of the machine pictured to produce hinges automatically and without scrap metal by using only one large machine. Mr. Stocker attempted to distinguish this machine by noting that it "rolls" the leaves of the hinges while plaintiff's machine "stamps" its leaves. He also testified that the steps these machines go through are "somewhat similar." Plaintiff distinguished another brochure presented by defendant by explaining that the process described therein only used two dies and produced large pieces of scrap waste. Hoffman stated he himself developed and designed the three die in one press

concept while at Portage Tool Company. Referring to the production of hinges, on cross-examination, Sperling stated it would be "quite unique" to put all three dies in one press. Although Sperling was an expert in tool and die manufacturing, he had "never designed a hinge die."

Mr. Stocker testified that plaintiff produced hinges three times as quickly as S & S could without the new carbide dies from Darnel. Mr. Stocker stated his machines are able to produce 133 feet of hinge per minute as a result of the ability of the press to slice 4-inch hinges at a rate of 400 strokes per minute. Meyers stated that the S & S presses formerly produced 38 or 40 feet of hinge per minute. Meyers stated that the Darnel line would allow the presses which operate at 240 strokes per minute to cut 5-inch hinges, thus making approximately 100 feet of hinge per minute.

Sperling estimated that he could design a die which would produce 83 feet of hinge per minute. Defendants also claimed, supporting their contentions with exhibits, that other punch presses operate at speeds of 800 to 1600 strokes per minute; the carbide composition in the blades does not assist the machines in cutting at a faster rate but only provides for longer wear; and it is possible to increase the speed of production by merely extending the length of each hinge cut and acquiring minor parts to adjust the feed pace and pressing speed. Defendants also point to the testimony of plaintiff's present chief engineer, who stated plaintiff produced hinges 1.25 inches long on its three press line at a speed of 500 inches per minute, equivalent to approximately 42 feet per minute.

Mr. Stocker countered these assertions by noting that the high speed punch presses above discussed were pressing laminations rather than complex hinges; it is difficult to increase the speed of production because generally the heavy weight of the presses, particularly those holding three dies, slows the speed of the rams moving the blades and the number of feet of hinge produced per minute is a complex calculation affected by the detailed forming processes involved in creating each individual hinge.

With respect to the uniqueness of the individual parts used in the construction of plaintiff's machines, Mr. Stocker listed several component parts which he stated were custom-made while Hoffman was employed by plaintiff and which created a unique manufacturing process when consideration was given to their composite effect. These various components were the design of the carbide slotting punches, the pilots, the payoff reels, the dampening devices, the retention of the cutting blades in the dies; and, finally, certain methods of supporting, clamping, curling, feeding and cutting off the hinges. In response Hoffman stated he designed the method of retaining blades in the dies while at Portage; the finished products produced by both S & S and Stocker were essentially identical and each of the mechanical parts in Stocker's dies were used in

every progressive carbide die. Hoffman also stated that the pilots, stops, feeding devices, or shapes of these parts were not unique but were available to the industry at large. Mr. Stocker testified that the machines used by plaintiff were specially designed and not commercially available.

Plaintiff points to several other portions of the record to support its claim that Hoffman "admitted" selling the Stocker dies to S & S. For example, according to Mr. Stocker, during a conversation between himself and Hoffman in court chambers, Hoffman stated he was building three dies for S & S and responded "yes" when Mr. Stocker queried if these dies were not what Hoffman had "done for us in the past." Plaintiff also stresses that during cross-examination Hoffman stated he "might have" referred to drawings made during his employment by plaintiff when preparing the S & S dies. However, Hoffman explained he was checking the physical size of commonplace articles such as screws and plates. Plaintiff notes that in another portion of Hoffman's cross-examination he stated the S & S dies contained precurl stations, hand positioners and piloting systems, component parts found in plaintiff's dies. Hoffman insisted these parts are common features of all die constructions.

Defendants urge that Mr. Stocker's vacillation in response to questions concerning the methods used by other hinge manufacturers indicates an absence of proof that the plaintiff's design processes are unique. Mr. Stocker stated other hinge manufacturers used scrapless and automated methods of production but he was unable to explain the details of these competitors' manufacturing methods.

■■ To justify issuance of a preliminary injunction, plaintiff must establish by a preponderance of the evidence: (1) possession of "a certain and clearly ascertained right which needs protection" (*Bromberg v. Whitler* (1977), 57 Ill. App. 3d 152, 155, 372 N.E.2d 837; *Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App. 3d 348, 354, 302 N.E.2d 394); (2) immediate and irreparable injury if the preliminary injunction is denied (*McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 417, 364 N.E.2d 420); (3) lack of adequate remedy at law (*La Salle National Bank v. County of Cook* (1974), 57 Ill. 2d 318, 322, 312 N.E.2d 252); and (4) "probability of his ultimate success on the merits." *Keystone Chevrolet Co. v. Kirk* (1978), 69 Ill. 2d 483, 486, 372 N.E.2d 651; *Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B* (1976), 63 Ill. 2d 514, 523-24, 349 N.E.2d 36.

In reviewing the result reached by the trial court, it is not our function to determine conclusively if plaintiff possesses a trade secret (see *Lonergan v. Crucible Steel Co. of America* (1967), 37 Ill. 2d 599, 611, 229 N.E.2d 536), but rather to ascertain whether the court abused its

discretion in denying the requested injunction (*Summit Electric Co. v. Mayrent* (1974), 17 Ill. App. 3d 545, 550, 308 N.E.2d 313.). The decision to grant a preliminary injunction rests within the sound discretion of the trial court (*Schlicksup Drug Co. v. Schlicksup* (1970), 129 Ill. App. 2d 181, 186, 262 N.E.2d 713), and "[t]he only question reviewed in such an appeal is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought." *Schwalm Electronics, Inc.*, 14 Ill. App. 3d 348, 352.

Upon consideration of the conflicting testimony given by Mr. Stocker and by defendants' witnesses Hoffman, Meyers and Sperling, it is our opinion that in each of the four allegedly unique areas plaintiff failed to establish the distinctive and secret nature of its manufacturing processes by a preponderance of the evidence. Mr. Stocker maintained the cutting blades were unique to the industry in view of their carbide composition and the ability of these blades to cut material more than twice their own thickness. Plaintiff claims this contention is supported by Sperling's assertion it would indeed be unique if a .020 inch thick blade sliced .050 inch thick material. However, Hoffman's testimony that plaintiff actually uses .034 inch thick blades to cut .050 inch thick material undermines the claimed supportive effect of Sperling's completely hypothetical comment. Similarly, while Mr. Stocker claimed that the use of three dies in one press is unique in the present state of hinge production, he himself stated he was unfamiliar with the manufacturing methods of competitive hinge companies. The brochures offered in evidence by defendants illustrate the employment of at least two dies in one press and the ability of another single machine to create an assembled hinge.

A clear conflict is revealed in the comparison of Mr. Stocker's testimony and defendants' witnesses regarding the speed of hinge production. Although Mr. Stocker maintained his machinery produces an unusually large quantity of hinge feet per minute, defendants' witnesses claimed this speed is relative to the length of the hinge being produced and testified that only minor adjustments are necessary to obtain increased speeds. Even more disparate positions are revealed in the statements of Mr. Stocker and Hoffman with respect to the uniqueness of the component parts. Although Mr. Stocker listed several mechanical parts which he claimed were custom-made for the plaintiff's machinery and unique to the industry, Hoffman repeatedly insisted that each of these elements is known to other tool and die engineers and manufacturers with reference to design and function. We recognize plaintiff's theory that it is the composite nature of these individually designed parts which created a unique system. However, Hoffman's analysis of the specific elements raises serious doubts as to the unique quality of both the sum of the parts and the individual designs.

■■ ■ We are also unpersuaded that Hoffman's comments concerning his possible reference to plaintiff's drawings resolve the central question of whether the S & S dies are copies of any unique or secret process of plaintiff. An indispensable element of the trade secret claim · is the establishment of a unique system "unknown to others in the industry." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387, 212 N.E.2d 865, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225. See also *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92-93, 273 N.E.2d 393; *Bimba Mfg. Co. v. Starz Cylinder Co.* (1969), 119 Ill. App. 2d 251, 263, 256 N.E.2d 357, *appeal denied* (1970), 44 Ill. 2d 583.) In sum, although we find various contradictions in testimony, as above shown, we are unable to conclude that plaintiff proved the necessary elements for a preliminary injunction by a preponderance of the evidence.

Upon consideration of the entire lengthy record before us, we conclude for purposes of this interlocutory appeal that defendant Hoffman did not appropriate a trade secret from plaintiff but rather exercised his privilege of utilizing "general skills and knowledge acquired during his tenure" with plaintiff and during his previous employment with Portage. (*Schulenburg*, 33 Ill. 2d 379, 387.) In our opinion, the order appealed from denying plaintiff's application for temporary injunction is fully supported by the weight of the evidence and is well within the discretion of the trial judge. We wish once more to stress that in this opinion we are deciding only the merits of the order denying the preliminary injunction. We cannot and do not decide here the "merits of the case." *Lonergan*, 37 Ill. 2d 599, 611.

Plaintiff additionally contends it was prejudiced by the court's rulings on several of plaintiff's motions for discovery and production of documents. We note initially that the trial court is given wide discretion with respect to the "kind and extent of hearing" on a motion for preliminary injunction. (*Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill. App. 3d 338, 344, 290 N.E.2d 701, *appeal denied* (1973), 53 Ill. 2d 606; *Naxon Telesign Corp. v. Selig* (1962), 38 Ill. App. 2d 242, 244, 186 N.E.2d 666.) In addition, the trial court has wide pretrial discovery discretion so that its orders concerning discovery will not be modified absent an "affirmative showing of abuse" which an appellant must clearly show. *Bicek v. Quitter* (1976), 38 Ill. App. 3d 1027, 1030, 350 N.E.2d 125.

Plaintiff claims the trial court erred in not allowing plaintiff's attorney to view, with the aid of an expert, 11 drawings prepared by Darnel for S & S. It is undisputed that the trial court permitted plaintiff's attorney to examine these drawings during a recess taken while Meyers was testifying and that plaintiff's counsel viewed the drawings again in the office of counsel for defendants. However, the remaining details regarding the examination of these drawings are completely obscured by charges and

countercharges made by each counsel against the other. For example, counsel for defendants claim that counsel for plaintiff tried to, or did, copy parts of the drawings. Counsel for plaintiff specifically denies each and all of these charges. As we view the entire record, this issue is rendered incomprehensible by argument between counsel which at times became almost personal in nature.

■■ Under these circumstances, we can conclude only that it was impossible for the trial court to satisfy the claims and contentions of both sides. We cannot say from the record that plaintiff has clearly shown that any ruling of the trial court constituted an abuse of discretion. It appears that the complete lack of harmony and cooperation between opposing counsel made the task of the trial court extremely difficult. In our opinion, the trial court did an excellent job of being fair to both sides in the face of constant bickering which made his task quite unenviable.

Plaintiff also claims it was prejudiced when the court quashed several notices for taking of discovery depositions. Plaintiff filed its complaint for injunction September 14, 1977, and its motion for temporary restraining order and preliminary injunction on September 19, 1977. An agreed order was entered September 19, 1977, granting the temporary restraining order for 10 days and permitting discovery to commence. The trial court thereafter quashed the deposition notices filed by plaintiff on September 19, 1977, while the court took under consideration various motions filed by defendants to strike plaintiff's complaint. The court continued in effect the portion of the September 19, 1977, order maintaining the status quo between the parties until December 2, 1977, when the temporary restraining order was dissolved and the preliminary injunction was denied. On November 8, 1977, plaintiff again filed notices for depositions. After a series of continuances entered by the trial court while it considered defendants' answer to plaintiff's motion for injunctional relief and plaintiff's response to this answer, the trial court quashed these additional notices.

It is important to note that the trial court was, virtually from day to day, hearing testimony from Mr. Stocker, Meyers, Sperling and Hoffman as adverse witnesses, as well as on direct and cross-examination. These hearings extended from September 16, 1977, through November 30, 1977. Some of these witnesses were designated as deponents in the deposition notices.

The Supreme Court Rules provide that "the court may supervise all or any part of any discovery procedure" (Ill. Rev. Stat. 1977, ch. 110A, par. 201(c)(2)) and enter protective orders "as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." Ill. Rev. Stat. 1977, ch. 110A, par. 201(c)(1).

■■ The trial court thus exercised his grant of flexible powers of supervision under the rules for the purpose of facilitating his hearing of the motion for injunction. On the entire record, we are satisfied that there was no abuse of discretion by the trial judge in this regard but rather that he proceeded with a careful and temperate management of the thorny problems presented by the taking of depositions. (See *Bicek*, 38 Ill. App. 3d 1027, 1030.) We have carefully considered the cases cited by plaintiff which defendants have attempted to differentiate. (*Goldman v. Checker Taxi Co.* (7th Cir. 1963), 325 F.2d 853; *Tansey v. Robinson* (1960), 24 Ill. App. 2d 227, 164 N.E.2d 272.) We find that these authorities are not applicable because they involve the taking of depositions and production of documents in preparation for trial on the merits rather than the problems resulting from extended hearings on a motion for preliminary injunction.

We note here that plaintiff urges that the trial court unduly restricted plaintiff's cross-examination of various witnesses. We need not extend this opinion by describing and discussing each of the many incidents cited by plaintiff. In our opinion, all of these matters are governed by the general principle that the "scope of cross-examination resides within the sound discretion of the trial court and we cannot properly upset the exercise of that discretion unless there has been an abuse of discretion." (*Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 71, 264 N.E.2d 170.) We find no abuse of discretion here.

Finally, plaintiff contends the trial court erred in denying Mr. Stocker the right to consult with counsel for plaintiff. Plaintiff takes the position that the trial court prevented counsel for plaintiff from conferring with Mr. Stocker during court recesses in the course of the cross-examination of this witness.

We find in the record no direct command by the trial court to this effect. However, all counsel agree that some such restriction on conferences between attorneys and witnesses was observed. Apparently this was without objection from any attorney. But, on October 11, 1977, at the conclusion of the first day of Mr. Stocker's cross-examination testimony, counsel for plaintiff reminded the trial court that it had earlier "instructed the witness not to speak to anyone while he was off the stand." Counsel for plaintiff then informed the trial court that he would like to be able to talk to Mr. Stocker but "we won't be discussing his testimony. We would like to be able to confer with him otherwise." Counsel also stated, "I don't want to discuss with Mr. Stocker or suggest any answers to him. But I think we are entitled to have an understanding of some of these new matters that have been brought up here." The trial court then informed counsel for plaintiff that he should confer with Mr. Stocker when the

witness was "off the stand." We take this to mean that counsel and Mr. Stocker should confer after the latter's testimony was completed.

On the merits of the situation, we are quite unable to agree with plaintiff's position that this minor matter requires reversal of the order appealed from. In our opinion, the right of a party to counsel in a civil case is quite divergent from the right of defendant in a criminal prosecution. In *People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96, the court reversed a conviction where the defendant was prohibited by direction of the trial court from discussing his testimony with his attorney during an overnight recess. The supreme court placed this result squarely upon the sixth amendment to the Federal Constitution. The court held that this right was so fundamental that it should be classified as absolute. Thus no showing of actual prejudice was necessary. (*Noble*, 42 Ill. 2d 425, 429, 431.) We find the same result reached in *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330. There, the trial court prohibited communication between defendant and his counsel during an overnight recess that lasted for 17 hours. The court based this ruling upon the sixth amendment to the Federal Constitution which guarantees the right of the accused in all criminal prosecutions to have the assistance of counsel for his defense.

We cannot equate the rule in criminal cases with the case at bar. The one authority cited by plaintiff to this effect is *Thompson v. Atlantic Building Corp.* (D.C. Mun. App. 1954), 107 A.2d 784. There, in a civil case, the trial court admonished plaintiff not to discuss his case with anyone, including his attorney, until his testimony was completed and he had left the witness stand. The Municipal Court of Appeals for the District of Columbia reversed a judgment in favor of defendant. The court stated, "[W]e feel that the right to effective assistance of counsel in the course of a trial is as necessary and important to a civil litigant as to an accused in a criminal proceeding." (*Thompson*, 107 A.2d 784, 785.) In *Geders*, the United States Supreme Court expressly pointed out the special importance of the right to representation and consultation between the accused and his attorney in a criminal case (*Geders*, 425 U.S. 80, 88-89, 47 L. Ed. 2d 592, 599, 96 S. Ct. 1330). In our opinion, quite aside from, and in addition to, the express mandate of the sixth amendment to the Federal Constitution, in criminal cases there are practical differences which make such a rule unnecessary in civil proceedings.

■■  We do not imply that the trial court has unlimited rights in this type of situation in a civil case. There may possibly be circumstances in civil cases in which extreme orders by a trial court regarding communication between lawyer and client would result in prejudicial error. We find no such situation in the case at bar. Here, Mr. Stocker's examination was

completed several days after the incident between the court and counsel as above described. By October 13, 1977, Mr. Stocker had completed his testimony. He did not take the stand again until November 17 for redirect examination. That date was the last time that he testified. The order appealed from was entered December 2, 1977. It therefore appears that there was a long and ample period of time during which counsel for plaintiff was obviously free to consult extensively with Mr. Stocker on all facets of this case.

Counsel for plaintiff make no statement of any kind tending to show actual prejudice. They simply state in their brief that the rule against forbidding consultation between witness and counsel is "immutable." No showing of any kind is made by plaintiff's counsel concerning the subject matter that he wished to take up with any representative of his corporate client at any time. No instance is pointed out in which the ruling of the court hampered counsel from fully discharging his duties toward his client. We find no error in this regard and plaintiff's contention is accordingly rejected.

One additional matter requires attention. On May 2, 1978, plaintiff filed a petition for instruction by this court with respect to the assumption of the cost of preparing excerpts from the record. (See Supreme Court Rule 342(h), Ill. Rev. Stat. 1977, ch. 110A, par. 342(h).) The petition set forth that the total cost of reproduction of the excerpts was $1502.30. It alleged also that defendants had been derelict in assisting plaintiff in reducing the size and therefore the expense of the excerpts. On May 4, 1978, defendants filed an answer to this petition. Defendants took the position that plaintiff had never specified exactly what portions of the record designated by defendants were unnecessary and plaintiff was tardy in advising defendants of their objections to the portions of the record designated by defendants. Defendants also averred that two-thirds of the total excerpts had been designated by plaintiff and only approximately one-third by defendants.

On May 11, 1978, plaintiff filed a reply to this answer. In substance plaintiff averred that approximately 100 of the pages designated by defendants pertained to frivolous factual issues raised by defendants or contained superfluous testimony. Plaintiff referred specifically to record pages 127 to 139 inclusive reflecting a portion of cross-examination of Mr. Stocker by counsel for defendants Darnel and Hoffman as being superfluous and unnecessary. In its petition, plaintiff prayed that this court divide the cost of the excerpts evenly between the parties.

We find it completely unfeasible for us to examine each and every page of the excerpts and to make the determination as to which parts were not necessary. We have, however, examined record pages 127 to 139 inclusive which are the only portion of the excerpts specifically designated by

plaintiff as being unnecessary. We cannot say that these pages were unnecessary to a proper presentation of defendants' theory of the case. Plaintiff's motion for taxation of certain of the excerpt costs against defendants is accordingly denied.

The order appealed from is affirmed.

McGLOON and BUCKLEY, JJ., concur.