THE SCOTT AND FETZER COMPANY, d/b/a Flex-N-Gate Division of the Scott and Fetzer Company, Plaintiff-Appellant, *v.* SHAHID R. KHAN *et al.*, Defendants-Appellees.

Fourth District   No. 15354

Opinion filed August 7, 1979.

Webber and Thies, P. C., of Urbana, and Hahn, Loeser, Freedheim, Dean and Wellman, of Cleveland, Ohio, for appellant.

William M. Goldstein, of Gaston and Goldstein, of Urbana, for appellees.

Mr. JUSTICE MILLS delivered the opinion of the court:

Interlocutory appeal.

Denial of preliminary injunction.

The trial judge ruled no trade secrets and failure to show a probability of success on the merits.

He was right.

We affirm.

### BACKGROUND

The facts are prolix, but they must necessarily be recited in detail. Flex-N-Gate, a division of Scott & Fetzer, is engaged in the business of manufacturing step and hitch bumpers for the pickup truck market. These bumpers have a one-piece shell construction signifying that the face bar, hitch area, and step are made from one continuous piece of metal.

In September of 1970, defendant Khan was employed by plaintiff's predecessor, Mobility Manufacturing Company, and continued to be employed by plaintiff until July 1978. In October 1973, shortly after Mobility merged with Scott & Fetzer, Khan signed an agreement which provided that in consideration of his continued employment with plaintiff, he agreed that "every invention, improvement, product, process, apparatus, or design" which he devised or conceived during his employment would belong exclusively to plaintiff. The agreement further provided that any such invention would be assigned to the company, and Khan agreed to disclose any such invention or confidential information to the company.

On April 27, 1977, the defendant signed a letter addressed to the board of directors of Scott & Fetzer which stated that he was not

affiliated with any organization engaged in a business which was competitive with plaintiff or its subsidiaries, or which was a customer of plaintiff, or from which plaintiff purchased or rented materials, equipment, supplies or services. The letter also stated the defendant had no investment or financial interest in any such organization, and in it he agreed to advise plaintiff promptly of any changes which would qualify or nullify the statements made in the letter. The express purpose of this letter was to advise and assure plaintiff that the company's policy of prohibiting executives and other key employees from having interests which conflicted with those of plaintiff was being implemented.

In November or December of 1977, a representative of the company submitted to Khan additional documents similar to those signed in September 1970 and April 1977. However, Khan refused to sign these documents. The reason for this refusal is obvious. In July 1977, defendant Khan and Stephen Bonner, then operations manager of Flex-N-Gate, had a conversation in regard to the defendant's future employment status with the company. The substance of this conversation is disputed by the parties. Khan informed Bonner that he planned to leave the company and that he would continue to work for the company on a part-time basis. The testimony on the amount of time Khan would devote to plaintiff's business varied from 75 to 90%. Khan would remain at his present salary but he would not receive a raise that was then warranted.

Khan testified that he was to be free to conduct outside business and that he told Bonner of his "game plan." Khan stated that he was attempting to get a consulting contract and that he intended to solicit design work with the hope of getting O.E.M. (Original Equipment Manufacturer) manufacturing business in the automotive field whether it was making stampings, bumpers, or anything else. Bonner, however, testified that Khan told him that he had either acquired or was contemplating a consulting contract with General Motors regarding a door brace and that bumpers were never discussed. Bonner sent a memo concerning this conversation to a vice president of plaintiff and stated in the memo that Khan would not be giving his full time to plaintiff and that Khan would be leaving as soon as a new engineer could be found.

In July 1978, Khan terminated his employment with Flex-N-Gate. Prior to this, in September 1977, he had started defendant Bumper Works as an unincorporated business. Bumper Works was incorporated in April 1978 and began production of single-shell step and hitch bumpers in August 1978. In addition to Khan, the directors of Bumper Works include three persons who do chrome plating business in Detroit. These three persons also do chrome plating business for Flex-N-Gate, and it is through that arrangement that Khan became acquainted with them.

Khan had constructed a wooden bumper mockup in September 1977

for Bumper Works and had taken a sample to Chrysler in January 1978. Between July 1977 and July 1978, he contacted Chrysler, Datsun, and C. Itoh, in regard to O.E.M. sales by Bumper Works. These negotiations led to Bumper Works' acquisition of contracts with Chrysler and C. Itoh for construction of bumpers which are used on small pickup trucks.

At the hearing on the request for a preliminary injunction in October 1978, Stephen Bonner testified that Flex-N-Gate and Bumper Works were the only producers of one-piece step and hitch bumpers. This one-piece construction of the shell eliminates corrosion, chrome plating, and painting difficulties. He also testified that other manufacturers do use one-piece construction, but not for step and hitch bumpers. Khan admitted that no one made a bumper exactly like the one produced by Flex-N-Gate, but there were similar bumpers being constructed in the industry.

Dave Kirkolis, an assistant engineer for plaintiff, compared the Flex-N-Gate bumper with the one manufactured by Bumper Works. Both had a one-piece drawn shell, three hitch holes, and an open back hitch area. They have similar arrangements for attachment of brackets and both use 3M Scotch tread for a no-skid surface. Both have a raised area on the step of the bumper. Kirkolis said that he believed the process for punching the holes in the bumpers is similar. On cross-examination, he stated that the kick plate, three-hole hitch, use of Scotch tread, and an open back were not unique to these two manufacturers nor is a one-piece shell construction. The Scotch tread on the Bumper Works product is wider and the bolts used on both bumpers are commercially available. While both companies use cold rolled material, Flex-N-Gate uses a different grade making its bumper 12 pounds heavier than that of Bumper Works. Flex-N-Gate also uses a different paint than the type used by Bumper Works. Additionally, the Bumper Works bumper has a one-inch wider step area and is shorter in length by two inches. There is also a difference in the yoke area of the bumpers in that Flex-N-Gate's is one piece and Bumper Works' is four pieces and has extra reinforcing structure not employed by Flex-N-Gate. This results from Flex-N-Gate's use of a thicker material. The hitch holes have the same spacing but are of a different size. Flex-N-Gate angles the side of the hitch area and uses a decal for load instruction. Bumper Works, on the other hand, has a perpendicular hitch area and stamps the load information into the metal.

Defendant Khan testified as to the distinctions between the bumpers. He testified that Flex-N-Gate was not overly concerned with obtaining O.E.M. accounts but was primarily concerned with obtaining after-market accounts. Khan stated that the principal reason for the differences between the two bumpers is that Flex-N-Gate chiefly supplies after-market distributors. However, Semmelsberger, vice president of Scott & Fetzer, testified that the O.E.M. market was very important to Flex-N-

Gate but the company also feared upsetting their normal market. Since more manufacturers are putting bumpers on at the plant, Flex-N-Gate needs to expand in this area and Semmelsberger testified that Khan was aware of this fact.

Khan testified that the Bumper Works product was custom designed to be lighter and that Flex-N-Gate did not have the capability of doing this because its tooling is used to make bumpers for an entire range of vehicles. This allows Flex-N-Gate to produce a cheaper bumper more quickly than can Bumper Works. The advantage of defendant's bumper, however, is that it is lighter. This allows for increased gas mileage to meet EPA requirements.

Because the products are different in configuration, the trial court ruled that if a trade secret existed, it is in the processes used to produce the particular product.

The techniques or processes followed in constructing a bumper were explained by Khan as blanking, forming, extruding, shearing, punching, welding, and painting. He explained that he translated the stock article into what the needs were in a given case. While some of the methods used at Bumper Works were different from those used at Flex-N-Gate, Khan said they were not necessarily an improvement but based only upon the desires of the purchaser. Khan admitted that although the tooling specifications were standard industry practice, he would consider such to be confidential information. He explained that the principles and practices of shearing, blanking, and forming were over 50 years old but had been refined in the last few years. He read the accepted principles and practices and basically used them to fulfill whatever the needs of Flex-N-Gate were. He testified that everyone in the industry uses the same processes to produce one-piece bumpers and only the overall design changes from company to company. According to Khan, it was not necessary for him to use the confidential information concerning Flex-N-Gate's specifics of tooling and equipment to produce the Bumper Works product.

Khan testified that the Bumper Works and Flex-N-Gate bumpers were based on two different philosophies. The Flex-N-Gate philosophy is to design for lower cost, maximum flexibility, and widest range of products. The Bumper Works philosophy is for lightest weight and to produce only one product.

Once O.E.M. contracts are let for a particular year, the ability of someone else to get in the market is very difficult—almost nonexistent. Flex-N-Gate's market has continually eroded the last three years and its survival is dependent upon acquiring O.E.M. business. In several business plans prepared by Khan, he indicated the importance of O.E.M. accounts to Flex-N-Gate and listed acquisition of this business as one of his

functions when he prepared his job description. However, Semmelsberger testified that Flex-N-Gate did not have bumpers ready for the 1979-80 truck models and that a manufacturer has to be ready to supply bumpers a year before introduction of the chassis. At the time of trial, it was not known whether Flex-N-Gate could get the Chrysler and C. Itoh O.E.M. contracts now held by Bumper Works even if a preliminary injunction were issued.

The lower court denied plaintiff's request for a preliminary injunction and this interlocutory appeal ensued.

## ISSUES

■■ Before Flex-N-Gate is entitled to a preliminary injunction, it has the burden of showing: that it has no adequate remedy at law and will be irreparably injured if the injunction is not granted; that the threatened injury will be immediate, certain and great if the injunction is denied and the loss or inconvenience to the opposing parties will be comparatively small and insignificant; that it has a reasonable likelihood of prevailing on the merits; and that the preliminary injunction will not have an injurious effect upon the general public. *McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 364 N.E.2d 420.

■■ In reviewing the result reached by the trial court, it is our function not to determine conclusively whether plaintiff possesses a trade secret, but whether the court abused its discretion in denying the requested relief. The question we address is whether there was a sufficient showing to sustain the trial court's order. *Stocker Hinge Mfg. Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.

Plaintiff first argues that the court abused its discretion when it ruled that no trade secret exists in this case. The leading Illinois case in the field of trade secrets defines them as

> " 'a plan or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it. * * * A process commonly known in the trade is not a trade secret and will not be protected by injunction, but the mere fact that there are secret processes of a different kind accomplishing the same result will not prevent the granting of an injunction.' (22 Cyc. 842.)" *Victor Chemical Works v. Iliff* (1921), 299 Ill. 532, 545-46, 132 N.E. 806, 811.

■■ Khan testified that the technology for forming a single-shell, step and hitch bumper is in the public domain. He had used literature in the field, not as a cookbook, but to analyze the product and its elements. He used his engineering background to translate that information into various products. According to Khan's testimony, everyone in the industry uses the same processes to produce a one-piece bumper, and only the overall

design changes from company to company. Upon completion of his employment, Khan had the right to take with him the general skills and knowledge acquired during his tenure. But he may not take particularized plans or processes developed by his employer which are confidential or unknown to others in the industry. (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 212 N.E.2d 865, *cert. denied* (1966), 383 U.S. 959, 16 L. Ed. 2d 302, 86 S. Ct. 1225.) The evidence presented to the trial court did not indicate that Khan had appropriated plaintiff's trade secrets or confidential information.

Scott & Fetzer argue that since it originally took Khan two years to develop a successful bumper for it, he could not have done so for Bumper Works during the time span from the day he left plaintiff's employ in July 1978 and the date Bumper Works began producing in August 1978 without the use of plaintiff's trade secrets. It must be pointed out, however, that Khan had a total of seven years of engineering experience when Bumper Works was formed in September of 1977. An additional reason for rejecting this argument of plaintiff is inextricably tied to plaintiff's argument that Khan breached the duty an employee owes his employer when he negotiated with Chrysler and C. Itoh. This posture fails to take into account the fact that defendant Khan was authorized by plaintiff to hold outside employment in July of 1977. This gave Khan well over one year to develop the Bumper Works bumper prior to its production.

Plaintiff argues that this is a clear case for application of the rule that, unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of the agency. (Restatement (Second) of Agency § 393 (1958).) We cannot agree. While numerous cases are cited by plaintiff on this point, we note that in none of those cases had the agent been granted authorization to seek additional employment, even of a consulting nature.

■■ It is undisputed that Khan informed plaintiff in July 1977 that he desired to terminate his relationship with the company and that he would only be able to devote a portion of his time to Scott & Fetzer. Plaintiff accepted Khan's terms but now contends that the authorization was only for Khan to pursue a consulting contract with General Motors. Not only does this argument reject Khan's testimony as to the substance of his conversation with Bonner, but also fails to consider the fact that Khan's experience in the automotive field dealt almost exclusively with bumpers. In the memo that Bonner sent to his superiors, he explicitly stated that the defendant would not be giving 100% of his time to plaintiff. Because of this new status with the company, Khan failed to receive the "substantial increase in salary" which, according to Bonner, Khan deserved. Thus, while Khan was still an employee of plaintiff, he was also authorized to

hold additional employment. Based upon this evidence, the trial court could properly have concluded that plaintiff had failed to show a likelihood of prevailing on the issue of whether there was a breach of either the duty of loyalty or of the "affiliation agreement."

A preliminary injunction is an extraordinary remedy to be issued only with the utmost care. (*Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App. 3d 348, 302 N.E.2d 394.) Based upon the evidence presented to the trial court, it was not an abuse of discretion to deny the requested relief.

Affirmed.

REARDON, P. J., and GREEN, J., concur.