PAUL L. PRATT, P.C., Plaintiff-Appellee, v. DAVID L. BLUNT *et al.*, Defendants-Appellants.

Fifth District   No. 5—85—0531

Opinion filed January 24, 1986.—Rehearing denied February 26, 1986.

John W. Leskera, of Dunham, Boman & Leskera, of East St. Louis, and David L. Blunt, *pro se*, and Randolph E. Schum, *pro se*, both of Blunt & Schum, of Edwardsville, for appellants.

Paul L. Pratt and C. William Fechtig, both of Paul L. Pratt, P.C., of East Alton, and Thomas E. Hildebrand, of Brandt, Slate & Hildebrand, of Granite City, for appellee.

JUSTICE JONES delivered the opinion of the court:

The instant interlocutory appeal was brought as a matter of right pursuant to Rule 307 (87 Ill. 2d R. 307) from an order granting the plaintiff's petition for preliminary injunction. Plaintiff, Paul L. Pratt, P.C., had brought suit to enjoin the defendants, as former associates of its law firm, from solicitation of the plaintiff's clients. The trial court's order, entered June 25, 1985, prohibited the defendants from contacting past or present clients of the plaintiff without prior approval of the court during the pendency of the proceedings. On appeal the defendants contend that the trial court went beyond its jurisdiction in seeking to enjoin alleged ethical violations on their part in the practice of law and that the trial court's action resulted in the unconstitutional restriction of their rights of free speech under the first and fourteenth amendments. The defendants contend further that the record failed to support the trial court's grant of injunctive relief and that the plaintiff should be denied such relief under the equitable doctrine of unclean hands. Finally, the defendants contend that the trial court abused its discretion in failing to rule upon their motion for appointment of a judge from outside the county or to delay the proceedings in order to refer the matter to the chief judge.

Prior to March 27, 1984, the defendants, David Blunt and Randolph Schum, were salaried employees of the plaintiff law firm. On that date, defendant Blunt's employment was terminated, and defendant Schum submitted his resignation from the firm. Shortly thereafter, the defendants joined together to form a partnership for the practice of law.

On June 12, 1985, the plaintiff filed a complaint against the defendants, alleging that as a result of letters sent by the defendants in April 1984 to clients for whom they had worked while with the plaintiff law firm, the plaintiff had lost six clients who had discharged the plaintiff and hired the defendants. The complaint further alleged that the defendants had "solicited" Steven Early, a client of the plaintiff's, through their client, James Dumse, who had shown Early certain newspaper articles concerning the plaintiff. Count I of the plaintiff's complaint sought damages for loss of fees resulting from these actions by the defendants, while count II prayed that the defendants be enjoined from "any further solicitation of plaintiff's clients." Count II also sought the production of 22 categories of documents from the defendants, including contingent fee contracts executed by the defendants both before and after March 27, 1984, records from the plaintiff's office showing past, present and prospective clients, and all telephone billing records from the defendants' office and residences

since March 27, 1984. The plaintiff additionally filed a motion for preliminary injunction seeking to enjoin the defendants from further "contact with" or "solicitation of" its clients and requesting that the defendants provide the documents specified in its complaint at the time of hearing on the motion.

Prior to hearing on the plaintiff's motion on June 14, 1985, defendant Schum took a statutory change of venue from Judge Wendell Durr and requested that the case be assigned to a judge from outside Madison County. The case was reassigned to Madison County judge George Moran, Jr., who, at the hearing on the motion for preliminary injunction, indicated that assignment of the case to a judge outside the county was a matter to be decided by the chief judge. The defendants declined Judge Moran's offer to recuse himself and made no further motion to have the matter ruled upon by the chief judge.

At the hearing the plaintiff presented evidence regarding the defendants' actions, as alleged in the plaintiff's complaint, of sending letters to clients of the plaintiff after leaving the plaintiff firm and of attempting to persuade its client Steven Early to discharge the plaintiff by means of newspaper articles shown him by the defendants' client Dumse. In addition, the plaintiff presented evidence of another incident in which defendant Blunt allegedly induced C. E. Draffen to sign a contingent fee contract with the defendants by representing to him that he (Blunt) was associated with the Pratt firm.

Upon being called to testify by the plaintiff, defendants Blunt and Schum acknowledged having mailed approximately 100-150 letters to clients whose cases they had handled while with the plaintiff law firm. The letters were sent on or about April 24, 1984. Before sending these letters, the defendants had consulted with a representative from the Illinois State Bar Association regarding appropriate ethical standards for such action. The letters sent by the defendants stated:

> "This is to inform you that I am no longer associated with the Paul L. Pratt law firm. Attorney [David L. Blunt] [Randolph E. Schum] and I have formed the law firm of Blunt and Schum and will be practicing at the above location.
>
> You have the right to either leave your file with the Pratt firm for further processing by another attorney, or you may request your file be turned over to me for its continued handling.
>
> If you wish to leave your file with the Pratt firm, you need do nothing. However, if you wish your case to be transferred to me, you should write a letter to the Pratt firm and so indicate your preference.
>
> If you have any questions concerning this situation, I suggest

you contact the Pratt and/or this office for further information."

Both defendants testified that the decision to send such letters was made after they became aware that clients who called the Pratt firm asking for them were misled or misinformed as to their status or whereabouts. Defendant Schum stated that, while with the Pratt firm, he had kept addresses for clients with whom he had had a lot of contact after regular business hours on an "information sheet" at home and that he had sent letters to those clients "that I felt would miss me." Defendant Blunt testified that some of the clients in question had come to the Pratt firm originally because he (Blunt) was there, and Schum stated that he had had sole responsibility for cases assigned to him at the Pratt firm and had made all decisions concerning those cases.

On direct examination by the defendants, Paul Pratt, president and sole stockholder for the plaintiff, testified that on April 11, 1984, his office had sent letters to clients whose cases had been handled by the defendants, advising them that the defendants were no longer with the firm and that their cases had been assigned to other attorneys in the firm. While Pratt initially stated that such letters were sent "to counteract the unethical letters that [the defendants] sent out," he subsequently stated, when reminded that his letters preceded those of the defendants, that his letters were "to make sure that you [the defendants] didn't get the clients that you didn't have any right to." It was Pratt's position that neither Blunt nor Schum had originated any business while they were at his firm. Pratt testified additionally that on April 3, 1985, he had filed a complaint with the Attorneys' Registration and Disciplinary Commission, charging that the letters sent by the defendants constituted improper solicitation as proscribed by Disciplinary Rule 2—103.

Regarding the incident of alleged improper solicitation of the plaintiff's client Steven Early, the plaintiff produced evidence that on June 6, 1985, the defendants' client James Dumse had visited Early at his home to show him some newspaper articles reporting that the plaintiff had been sued for overcharging clients. Dumse had seen the articles in the car of the defendants' investigator when he had been in the St. Louis area to see his doctor and had asked the defendants' secretary to make some copies for him. He had shown the articles to his wife who had urged him to contact Early because Early had spoken with her about his representation by the plaintiff. Early subsequently called Dumse after hearing about the articles from Dumse's brother-in-law and, according to Dumse, had asked for the phone

number of Dumse's attorney. Dumse then took the articles to Early's house along with an informational booklet from the defendants' office containing their phone number. Early testified that Dumse had discussed the articles with him and had conveyed to him the impression that he ought to discharge the plaintiff and hire the defendants' firm to represent him.

C. E. Draffen testified regarding the third instance of alleged improper solicitation that in late July or early August 1984, defendant Blunt had contacted him by phone and told him that he had "picked [his] case up off the computer" and would like to come talk to him about it. Draffen had been contacted previously by an investigator from the plaintiff's office but had told him that he (Draffen) was not yet ready "to sign with a lawyer." Draffen stated that when Blunt came to see him, Blunt had told Draffen that he was associated with the plaintiff. Since Draffen still was not ready to sign, Blunt left a business card with his phone number on it. Draffen was contacted later that fall by an investigator from the defendants' office.

In February 1985 when Draffen was ready to sign, he called the number on Blunt's card, and the defendants' investigator came out and "signed [him] up." Draffen stated that he had thought he was signing with the Pratt firm at that time and that he did not learn otherwise until June 10 or 11, 1985, when he was again contacted by the plaintiff's investigator and then by Thomas Vance, general chairman of the Maintenance of Way Union. After discussing the situation with Vance and Gerald Wilson, former general chairman of the union and now an employee with the plaintiff, Draffen went to the plaintiff's office, where he signed a letter discharging the defendants from representing him.

In further testimony defendant Blunt stated that he had never been to Draffen's house and had not even met Draffen before the hearing. Although Draffen stated that the only business card he had was the one with Blunt's name on it, union general chairman Thomas Vance testified that he had given Draffen the plaintiff's office phone number in June 1984. Vance testified further that Draffen had indicated to him that he (Draffen) had not met Blunt in person and that Draffen had "gotten the impression" that Blunt was with the Pratt firm although Blunt did not specifically say this in his phone conversation. Draffen himself testified that the Pratt name did not appear on the letterhead of various items of correspondence between the defendants' office and himself from February to June 1985 or on the contract of representation he had signed with the defendants. Draffen had mailed letters to the law firm of "Blunt and Schum" and had

come to Edwardsville on June 4 and 5, 1985, when he had lunched with Schum and his wife, but had never asked about Pratt or his relationship to the defendants' firm.

Following the hearing, both parties submitted memoranda of law, and the trial court entered its order granting the plaintiff's motion for preliminary injunction. In its order, the trial court specifically found that neither Blunt nor Schum had originated any clients while they were associates of the plaintiff but that they were able to make contacts with clients and gain knowledge of cases to which they were assigned because of the position of trust and responsibility they had enjoyed as salaried employees of the plaintiff. In addition, the court found, the defendants were able to obtain a computerized list identifying the names and addresses of important clients.

The court concluded that the defendants' conduct "suggests a course of action for Pratt's clients [sic] and unfairly prejudices Pratt." This conduct, the court stated, "indicate[s] an intentional interference with the contractual rights of Pratt with his clients which is prohibited." The court found that the evidence was sufficient to prove that (1) an immediate and irreparable injury would occur if the preliminary injunction were denied, (2) there was a lack of adequate remedy at law, and (3) there was a probability of success on the merits. The court ordered, therefore:

"A. The defendants *** refrain from contacting, directly or indirectly, any past or present clients of plaintiff without prior approval of this court during the pendency of these proceedings;

B. That defendants [be] enjoined and restrained from representing to any prospective client *** that they are in any way associated with plaintiff;

C. That defendants [be] enjoined and restrained from using newspaper articles concerning plaintiff or plaintiff's president in obtaining future clientele;

[and] D. That defendants provide to the plaintiff within 28 days *** the [22 categories of documents] requested *** in Count II [of the plaintiff's complaint]."

On appeal from this order, the defendants contend initially that the trial court had no jurisdiction to enjoin alleged unethical conduct on their part as attorneys because the supreme court has the sole power to discipline attorneys. The defendants assert that since the plaintiff's action was based upon alleged improper solicitation rather than upon tortious interference with contract, the plaintiff's sole forum for relief was with the Attorneys Registration and Disciplinary

Commission (see 87 Ill. 2d R. 751), which considers such ethical violations and imposes punishment accordingly. Similarly, the defendants maintain that the plaintiff's failure to plead and prove tortious interference with contract makes this case distinguishable from *Adler, Barish, Daniels, Levin & Creskoff v. Epstein* (1978), 482 Pa. 416, 393 A.2d 1175, relied upon by the trial court, in which the court upheld an injunction restraining former associates of a law firm from conduct constituting tortious interference with existing contractual relationships between the law firm and its clients.

■ While it is true that the supreme court has exclusive jurisdiction to discipline attorneys (*People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346, 8 N.E.2d 941), the defendants have misconstrued the nature of the instant action as one brought to punish rather than to enjoin the defendants' conduct insofar as it affects the plaintiff. That improper solicitation by the defendants may also be the subject of disciplinary action before the Attorneys Registration and Disciplinary Commission does not preclude the plaintiff from seeking to restrain such conduct resulting in harm to the plaintiff.

■ The defendants' related argument that the plaintiff has failed to show an actionable claim for tortious interference with existing client contracts, as was the case in *Adler*, is more properly the subject for a motion directed toward the pleadings or for trial on the merits. Under the Restatement (Second) of Torts, relied upon in *Adler*, an action for tortious interference with contractual relations does not require the allegation and proof of interference with existing contracts but includes interference with prospective contractual relations, not yet reduced to contract, as well as interference with continuing business or other customary relationships not amounting to formal contracts. (Restatement (Second) of Torts sec. 766B, comment c, at 22 (1979).) Thus, the plaintiff could properly seek to enjoin conduct of the defendants that allegedly interfered with its relationships with clients even though no contingent fee contracts had as yet been entered into with these clients as in *Adler*. Since the plaintiff had a legitimate interest in its relationships with clients for which it sought protection, the trial court did not, by enjoining allegedly harmful conduct by the defendants, discipline the defendants or attempt to exercise jurisdiction in the disciplinary area.

■ The defendants next contend that the trial court's order granting injunctive relief unconstitutionally restricted their rights of free speech as guaranteed by the first and fourteenth amendments. The *Adler* court considered such a contention in a factual situation similar to the case at bar and held that an injunction against commun-

ications by former associates of a law firm with clients of that firm did not violate the first and fourteenth amendment guarantees of free speech. In *Adler* a former associate of the plaintiff firm contacted clients of the firm with open cases on which he had worked while a salaried employee. He advised these clients that he was leaving the firm and that they could choose to be represented by him, by the plaintiff, or by any other firm or attorney. The associate further mailed to the clients form letters which could be used to discharge the plaintiff as counsel, name him the client's new counsel, and create a contingent fee agreement. Other former associates too informed clients of the plaintiff of their plans to form a new firm, advising the clients that they were free to discharge the plaintiff and retain the new firm in its stead.

The *Adler* court concluded that these actions constituted improper solicitation proscribed by the Code of Professional Responsibility and enjoined the former associates from further contact and communication with clients who had active cases pending with the plaintiff firm at the time of their departure. The court observed that while commercial speech advertising routine services to the general public was protected under the first and fourteenth amendments, the State could constitutionally impose sanctions upon attorneys for conduct which violated disciplinary rules against solicitation and self-recommendation even though such conduct involved "commercial speech." Under this reasoning the defendants conduct here of attempting to induce clients of the plaintiff to change law firms in the middle of their active cases may, to the extent that it is prohibited by disciplinary rules, be enjoined without violating the defendants' constitutional rights of free speech. We adopt the reasoning of the *Adler* court and accordingly reject the defendants' contention that the trial court's order unconstitutionally restricted their rights of free speech.

The defendants next contend that the record failed to support the trial court's order granting injunctive relief and that the plaintiff should be denied such relief under the equitable doctrine of unclean hands. In addition the defendants contend that the order was overbroad in that it improperly affected their relationship with present clients and violated discovery rules regarding the production of documents.

It is settled that to justify issuance of a preliminary injunction, the plaintiff must establish by a preponderance of the evidence (1) possession of a certain and clearly ascertained right which needs protection; (2) immediate and irreparable injury if the preliminary injunction is denied; (3) lack of an adequate remedy at law; and (4) probabil-

ity of success on the merits. (*Roche Brothers v. Garrigan* (1980), 88 Ill. App. 3d 107, 410 N.E.2d 338; *Stocker Hinge Manufacturing Co. v. Darnel Industries; Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.) The decision to grant a preliminary injunction rests within the sound discretion of the trial court, and the only question upon review is whether there was a sufficient showing to sustain the order of the trial court. (*Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.) Since the preliminary injunction is a temporary measure intended to preserve the status quo pending a decision on the merits, it is not the function of the reviewing court to determine the merits of the controversy but rather to ascertain whether the trial court abused its discretion in granting or denying the requested injunction. *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125.

■ In the instant case, the trial court specifically found that the requirements for a preliminary injunction had been met. The court determined upon hearing the evidence that the defendants were engaged in a course of conduct to improperly solicit and obtain clients of the plaintiff. This determination was supported by testimony that the defendants had sent letters to clients of the plaintiff after leaving the firm, that the defendants' client Dumse had circulated newspaper accounts in an attempt to persuade the plaintiff's client to discharge the plaintiff and hire the defendants, and that defendant Blunt had obtained C. E. Draffen as a client by representing to him that he (Blunt) was associated with the plaintiff. While the plaintiff's evidence on these matters was not uncontradicted by the defendants, it was for the trial court to assess the credibility of the witnesses and to determine the weight of the evidence. From a review of the record we cannot say that the trial court abused its discretion in granting the preliminary injunction requested by the plaintiff.

■■ ■ The defendants' additional contention that the plaintiff should have been denied equitable relief under the doctrine of unclean hands is likewise without merit, because the record shows no abuse of discretion by the trial court in failing to apply the doctrine. In Illinois, misconduct on the part of a plaintiff that will defeat recovery in a court of equity under the doctrine of unclean hands must have been conduct in connection with the very transaction being considered or complained of and must have been misconduct, fraud or bad faith toward the defendant making the contention. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 422 N.E.2d 1166.) The doctrine is not a judicial strait-jacket that will prevent a court of equity from do-

ing justice and its application is not favored by the courts. (*Baal v. McDonald's Corp.* (1981), 97 Ill. App. 3d 495, 422 N.E.2d 1166.) While the defendants here have cited certain instances of alleged unethical conduct on the part of the plaintiff, such as referring a client's case to another attorney after informing him that the plaintiff's president Pratt would try the case personally and providing misleading and disparaging information about the defendants to clients in an attempt to retain them as clients of the plaintiff, this conduct by the plaintiff will not serve to cancel out similar unrelated acts of unethical conduct by the defendants. The further instance involving alleged improper solicitation of C. E. Draffen by the plaintiff, though directly concerning a transaction complained of by the plaintiff, would not require the denial of equitable relief to the plaintiff where this instance was merely part of a continuing course of conduct by the defendants for which the plaintiff sought an injunction. We therefore reject the defendant's contention that the plaintiff should have been denied relief on the basis of "unclean hands" and hold that the record was sufficient to sustain the trial court's order granting a preliminary injunction.

▇ We find, however, that the trial court's order was overbroad in that it prohibited the defendants from contacting past as well as present clients of the plaintiff during the pendency of the proceedings. The plaintiff's complaint sought only that the defendants be enjoined from any "further solicitation" of its clients, and we believe that such prospective relief is all that is warranted in this factual situation. The purpose of a preliminary injunction is to preserve the status quo pending disposition of the case on the merits (*Duval v. Severson* (1973), 15 Ill. App. 3d 634, 304 N.E.2d 747), the status quo being "the last actual, peaceable, uncontested status which preceded the pending controversy." (*Duval v. Severson* (1973), 15 Ill. App. 3d 634, 641, 304 N.E.2d 747, 752.) By the time the plaintiff here filed suit against the defendants over a year after the offending letters had been sent, the clients named in the plaintiff's complaint had become clients of the defendants. The trial court's order restraining the defendants from contacting past clients of the plaintiff would preclude them from communicating with their own clients and thus would change the status quo that existed before the plaintiff objected to the defendants' actions. Cf. *Duval v. Severson* (1973), 15 Ill. App. 3d 634, 304 N.E.2d 747 (preliminary injunction improper to extent that it preserved not the status quo but rather a *status quo ante*).

The plaintiff, while seeking damages for loss of fees from those clients named in its complaint, which it concedes have become clients

of the defendants, has sought only to preserve the status quo of being allowed to operate its law firm without further solicitation of its clients by the defendants. The instant situation is thus somewhat different from that in *Adler* where the plaintiff law firm filed an injunction within days after the former associates began efforts to obtain its clients. In *Adler*, moreover, the trial court expressly stated that nothing in its order enjoining communication with the plaintiff's clients should interfere with the clients' ability to discharge the plaintiff and select representation by the former associates or another attorney. Since the trial court's order here would interfere with the defendants' representation of clients who had been past clients of the plaintiff and disrupt the present attorney-client relationship between the defendants and their clients, the order was overbroad and must be reversed in that aspect. *Cf. Roche Brothers v. Garrigan* (1980), 88 Ill. App. 3d 107, 410 N.E.2d 338 (clients of defendant's accounting firm, who had previously patronized the plaintiff firm with whom defendant had been associated, could not be ordered to return their business to plaintiff or prevented from having future business relationship with defendant).

■ We likewise find that the order was improper as to that portion requiring the production of 22 categories of documents requested in the plaintiff's complaint. The plaintiff's request was essentially a substitute for the discovery procedure under Rule 214 (87 Ill. 2d R. 214), and there was no showing that the plaintiff would not have had an adequate legal remedy under that procedure. We therefore reverse the trial court's order as to paragraph D requiring the production of documents by the defendants.

■ Finally, we find no merit in the defendants' additional contention that the trial court erred in failing to rule upon their motion to appoint a judge from outside the county or to refer the matter to the chief judge for his determination. The record indicates that after Judge Moran had advised the defendants that their motion was a matter to be ruled upon by the chief judge, defendant Schum stated that he had already spoken with the chief judge who had told him that he (the chief judge) "would not appoint an out-of-county judge unless each and every [Madison County] judge would recuse himself." It appears, then, that the defendants sought to have Judge Moran rule upon a matter within the province of the chief judge after being advised by the chief judge of his position adverse to them on that point. The defendants chose not to take a change of venue from Judge Moran and made no further motion to have the matter ruled upon by the chief judge, and we find no error in Judge Moran's decision to proceed to hearing on the case.

For the reasons stated in this opinion, we reverse both that portion of paragraph A of the trial court's order enjoining the defendants from contacting past clients of the plaintiff and paragraph D. We otherwise affirm the trial court's order granting a preliminary injunction in favor of the plaintiff. The plaintiff's motion to supplement the record on appeal, which was taken with the case, is denied.

Affirmed in part, reversed in part.

KASSERMAN, P.J., and KARNS, J., concur.