THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RAYMOND PENDLETON *et al.*, Defendants-Appellants.

First District (4th Division)   No. 77-623

Opinion filed August 9, 1979.

James J. Doherty, Public Defender, of Chicago (David C. Daniels and James L. Rhodes, Assistant Public Defenders, of counsel), for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Joseph P. Quirk, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

Each of the defendants, Raymond Pendleton, Lawrence Samuels, Darryl Turner, Clarence Spann and Charles Brownlow, was indicted for

the rape (Ill. Rev. Stat. 1975, ch. 38, par. 11—1) of the complainant. A bench trial was held in the circuit court of Cook County. Following the presentation of all the evidence, a mistrial was declared because of claimed prosecutorial misconduct. Subsequently, after a second bench trial, the defendants were found guilty of rape and each defendant sentenced to a term of imprisonment.

The defendants appeal,* contending, *inter alia*, that the second prosecution placed them twice in jeopardy for the same offense in violation of the fifth amendment to the United States Constitution (U. S. Const., amend. V). While admitting that they failed to raise this double jeopardy claim below, either before or during the course of the second trial, the defendants contend that the issue is cognizable under our plain error rule (Ill. Rev. Stat. 1975, ch. 110A, par. 615(a)).

We agree and we reverse the convictions of the defendants.

At the first bench trial which was held in March 1975 before Judge Louis A. Wexler, Wanda Lloyd was called as a witness for the State. Wanda testified that on the night of May 28, 1974, she was at her home with the complainant. They were getting ready to go to a drive-in movie. At approximately 7:30 p.m., Wanda and the complainant were picked up by Thomas Bell and Lawrence Samuels. Thomas Bell's nickname is "Slim Bone" and he was Wanda's boyfriend. Lawrence Samuels' nickname is "Lefty" and he was the complainant's date.

Wanda testified further that the two couples drove to the apartment of Samuels' "aunt," where Samuels apparently was expecting a phone call. Subsequent testimony disclosed that the apartment actually belonged to the mother of Raymond Pendleton. Samuels was a close friend of the Pendleton family and often referred to Pendleton's mother as his "aunt."

Wanda, Bell and the complainant waited outside in the car while Samuels entered the apartment alone. About 20 minutes had elapsed when Samuels returned to the car and informed them that his "aunt" had not yet called. He invited them into the apartment to wait with him. Wanda, Bell and the complainant accepted the invitation.

As the two couples waited in the apartment, an unidentified man "dressed in pink" walked in, sat down and introduced himself. Neither Wanda nor the complainant had seen this man before. A short time later, Charles Brownlow, Clarence Spann, Darryl Turner, and Ronald Powells entered the apartment. After saying "hello" to Brownlow, Wanda and the complainant, they walked into the kitchen where they sat around a table

---

* Pendleton, Samuels, Turner and Brownlow are represented by the Public Defender's office. Spann, who is represented by a private firm, was allowed to adopt the Public Defender's brief for purposes of this appeal.

talking. Wanda and the complainant knew each of these men from the neighborhood.

Spann, Turner and Powells exited the apartment shortly before 9 p.m. At approximately 9:05 p.m., Bell and Wanda left the apartment to get some cigarettes and "drinks." When Wanda and Bell returned at approximately 9:45 p.m., the lights in the apartment were off. Wanda knocked on the door and called out the complainant's name. A man "in pink" opened the apartment door about an inch and said the complainant was not there. The door was then closed. When Wanda knocked again, a voice from inside the apartment said the complainant had left. Wanda insisted that the complainant would not have left without her.

When no further response was forthcoming from the apartment, Wanda and Bell walked away. Wanda asserted that she and Bell then sat in their car, which was parked near the apartment building, and argued for approximately 20-25 minutes about where the complainant might be. Bell eventually exited the car and told Wanda "he was going to carry the drinks to the people in the apartment." Wanda waited in the car for about 30-40 minutes. When Bell later returned, he and Wanda began arguing again about where the complainant might be. Wanda said she knew the complainant was in the apartment and that Bell should "go get her." Bell left the car but returned later, alone. After insisting that the complainant was in the apartment, Wanda again told Bell that he should "get her out of there." Bell returned to the apartment yet a third time and returned a short time later with the complainant and Charles Brownlow.

Wanda noticed that the complainant had scratches on her face and arms, and "her jaw was kind of pinkish." The complainant was crying and told Wanda she had been raped by Clarence Spann, Darryl Turner, Ronald Powells, Raymond Pendleton, and Charles Brownlow. Wanda then saw Spann, Turner, Powells and Pendleton leaving the apartment.

Bell informed Wanda and the complainant that his car was out of gas. Wanda asked Spann if he could give them a lift to the "Three Corners" liquor tavern. Spann agreed. The complainant, Wanda and Spann sat in the front seat of the car, while Brownlow, Turner and Powells sat in the rear seat. When they arrived at "Three Corners," Wanda telephoned and talked to her mother. Wanda and the complainant then walked, with Brownlow, to Wanda's home. During this short walk, the complainant accused Brownlow of raping her. When they reached Wanda's home, Wanda told her mother that the complainant had been raped. Wanda's mother called the complainant's mother and informed her of the incident. Wanda then walked the complainant home and the complainant's mother then called the police.

The State called Delores Ryan, a policewoman with the City of

Chicago, as its next witness. She testified that on the night of May 28, 1974, she received a radio message to proceed to a certain location and conduct an investigation as to an alleged rape incident. She arrived at the complainant's house and talked to the complainant's mother. Ms. Ryan observed scratches on the complainant's face and arms and a bruise "apparently on her cheek." In contrast to the five names the complainant had furnished Wanda earlier, the complainant gave Ms. Ryan the nicknames of only three possible offenders: (1) "Lefty" (Lawrence Samuels); (2) "D.T." (Darryl Turner); and (3) "Country" (Raymond Pendleton).

On the way to the hospital, the complainant pointed out to Ms. Ryan the apartment where the alleged rape occurred. The complainant was then transported to the hospital, and at that time the officers staked out the apartment where the alleged rape took place. Some time thereafter, Ms. Ryan received a call at the hospital informing her that some suspects had been taken into custody. Ms. Ryan and the complainant later proceeded to the 51st District police station where a lineup was conducted.

The State called the complainant as its next witness. The complainant substantially corroborated Wanda's earlier testimony about what transpired the night of May 28, 1974. The complainant stated further that after Bell and Wanda left the apartment to get some cigarettes and "drinks," Samuels called the complainant into the kitchen. At this point, Spann, Turner, Powells and Pendleton re-entered the apartment. Samuels took the complainant into the bathroom and said, "I want you to go out the window and come back, because these dudes are going to rip you off." After completing this statement, Samuels walked out of the bathroom.

The complainant followed Samuels and told him she wanted to leave. As she walked through the living room toward the door, she noticed Pendleton rolling a bed out of a nearby closet. The complainant tried to open the apartment door but it was locked. Samuels was "fooling around" with the lock when suddenly the lights went out. Somebody grabbed the complainant and threw her to the floor. She was crying and screaming. She asked Samuels to help her, "but he just backed away." When she screamed again, somebody hit her on the right cheek and told her to shut up. Somebody then pulled her pants down.

The complainant heard a male voice say: "I'm first." She identified the voice as belonging to Ronald Powells. After Powells had sexual intercourse with her, somebody picked her up off the floor and placed her on the bed. A second man then had intercourse with her. She did not know who that second man was. A number of other unidentified men "then took turns."

After the lights went out, the complainant was unaware if anyone left

the apartment. However, she did recall hearing "some dude" enter the apartment. She testified that somebody asked him if he wanted a turn and he replied that "he didn't want to go to jail for nothing like that."

The State then attempted to elicit testimony from the complainant which would identify those men who had sexual intercourse with her.

"[Prosecutor]: Do you know if anyone in that room did anything to you"

[Defense Counsel]: Judge, I object * * *.

[Prosecutor]: While you were on the bed with your pants down, what happened to you. Go into that instead—

The Witness: Each one of them had sexual intercourse with me.

[Prosecutor]: Q. Do you know in what order they had sexual intercourse with you?

A. No.

Q. Could you see—

[Defense Counsel]: She stated she doesn't know.

The Court: Let her answer.

The Witness: Well, after—I think after the second one had sexual intercourse, someone went in the washroom and turned the light on and the light was shining off the kitchen into the living room.

[Prosecutor]: Q. Did you see anything then?

A. Yes, I could see a little bit.

Q. What could you see?

A. I could see each one of them.

Q. Each one of whom?

A. The dudes.

Q. What could you see each one of these dudes doing?

A. Some was sitting on the couch, some were in the kitchen.

Q. What was happening?

A. They were talking to each other.

Q. What else was happening, what were you doing?

A. I was just laying on the bed and somebody was having sexual intercourse with me.

Q. Do you know who that was?

A. It was between Charly Brown [Charles Brownlow] and D.T. [Darryl Turner], I don't know.

[Defense Counsel]: I object to that, ask it be stricken.

The Court: I will strike it if she doesn't know who it was.

* * *

[Prosecutor]: Q. Could you see anyone come over to the bed where you were?

[Defense Counsel]: Your Honor—

The Court: She may answer.

[Prosecutor]: Q. After the light was turned on?

The Court: With the light in the bathroom giving you light to see the people there, could you see anyone getting on top of you at that time?

The Witness: Yes.

The Court: All right, go ahead.

[Prosecutor]: Q. Who could you see then?

A. I would have to say, if Charly Brown—it had to be D.T.

[Defense Counsel]: Your Honor—

The Court: Is it Charly Brown or D.T.?

The Witness: I was, well, really shocked.

The Court: You don't know?

The Witness: No."

The complainant went on to testify that after "they" finished, she got up and dressed. Samuels then told her to take her pants off because it was his turn. The complainant was questioned further.

"Q. Then what happened?

A. [Samuels] had sexual intercourse with me.

* * *

[Prosecutor]: Q. Was anyone else in the room at that time?

A. Yes.

Q. Who else was in the room?

A. Some of them. I don't know exactly who was in the room.

* * *

Q. Now, what happened after Lefty [Lawrence Samuels] had sexual intercourse with you?

A. Then we went all over again.

Q. Just what happened right after Lefty had sexual intercourse with you, what is the next thing that happened?

A. Then somebody else got on top of me.

Q. Who got on top of you?

A. I don't know.

Q. Who was in the room at that time?

A. I don't know exactly who all was in the room.

Q. Could you hear anyone saying anything?

A. They was mumbling and laughing.

Q. Who was mumbling and laughing?

[Defense Counsel]: Judge—

The Court: She doesn't know, sustained.

* * *

Q. What happened then?

A. Then they just kept getting on top.

Q. Who got on top?

A. I don't know."

The complainant testified that during this incident she heard Wanda and Bell come to the apartment door and then leave. Bell later returned and entered the apartment. As the complainant was dressing for the second time, she saw Brownlow, Turner, Samuels, Spann, Powells, Pendleton and a man she didn't know standing around in the room. Bell and Brownlow walked the complainant out to the car. The complainant told Wanda she had been raped.

On cross-examination of the complainant, the following colloquy took place:

"Q. * * * [Y]ou have testified that at no time did you know who actually was having sexual intercourse with you, is that correct, Miss Dickerson?

A. Well, I could hear them talking and I know who was in the room.

Q. I know, but you didn't know who was actually having sexual intercourse?

A. I don't know what order they was going in.

Q. You didn't know who was having intercourse with you at one particular time?

A. I knew that they was there.

Q. Miss Dickerson, I know what you are saying, but each time did you know which one was having intercourse with you?

A. No * * *."

A recess was declared and the cross-examination of the complainant was continued over the weekend to the following Monday.

Defense counsel concluded complainant's cross-examination on Monday morning. On redirect examination by the State, the following testimony was then elicited from the complainant:

"[Prosecutor]: * * * [D]o [you] know who had intercourse with you?

A. Yes.

* * *

[Prosecutor]: Who could that be?

* * *

The Witness: * * * Clarence Spann, * * * Charles Brownlow, * * * Richard Pendleton, * * * Laurence Samuels, * * * Darryl Turner, * * * Ronald Powells, * * * [and] the dude I don't know."

On re-cross-examination, the complainant admitted that during the weekend recess she had talked with the State's Attorney. She stated,

however, that the State's Attorney did not tell her what to say. A conference was then held in the trial judge's chambers. Defense counsel argued that it was "absolutely wrong" for the prosecutor to have talked with the complainant while she was still subject to cross-examination. He then moved to strike the complainant's redirect examination testimony.

Two Assistant State's Attorneys appeared at the Monday proceedings. One explained to the court that he had just met the complainant on that morning, having been assigned to substitute for a vacationing collegue who had participated in trying the case the past Friday. He introduced himself, told the complainant she would be subject to further cross-examination by the defense, and informed her that the State would probably ask her more questions on redirect examination. He then made the following representation to the court:

> "* * * I give you my word as an officer of this court that I did not prepare the witness, I didn't apprise her of her testimony, and I merely told her to tell the truth and she had nothing to fear."

Thereupon, the trial court denied defense counsel's motion to strike complainant's redirect testimony.

The State rested its case-in-chief. The defendant's motion for a directed finding of not guilty was denied. Several of the defendants then took the stand and testified in their own behalf. Following the close of all the evidence on the next day, Tuesday, defense counsel renewed his motion to strike the complainant's redirect examination testimony.

> [Defense Counsel]: Your Honor, if it please the Court, I would like to renew a motion * * *.
>
> The Court: Okay, let's go in chambers.
>
>           * * *
>
> [Defense Counsel]: * * * I'm renewing the same motion I made yesterday * * *."

Defense counsel argued that the complainant had been improperly influenced in some way because in her testimony on Monday she was able to make identifications "which she could not [make] [the preceding] Friday." The Assistant State's Attorney who had joined the prosecution team on Monday morning responded to this claim.

> "[The Assistant State's Attorneys] on Friday evening, Your Honor, had an occasion to sit down in our office on the fifth floor of this building, and we discussed this case, and [my colleague], Your Honor, went over all of her notes with me. We had a lengthy conference on this case. I would estimate for about an hour, an hour and a half, and [she] *indicated to me at that time that there was some difficulty, Your Honor, regarding identification.* [We] went over the elements of rape, and we were convinced,

Your Honor, that we had proven a prima facie case of rape but for a simple identification procedure. I, of course, asked [my colleague] at that time whether the victim in this case was still on the stand. She indicated that she was in the process of being cross-examined. [We] at that time between ourselves, Your Honor, had a conference relative to an in Court identification of the respective defendants in this case."

He then stated emphatically that neither of the prosecutors talked to the complainant Monday morning about the subject of identification.

The court then called the complainant to the stand and questioned her.

"The Court: * * * [D]uring the weekend * * * did you have a conversation with either one of the State's Attorneys * * *?
A. No.
Q. * * * After leaving [the stand] Friday * * * where did you go? * * *
A. * * * I went back up to the State's Attorney's office.
Q. * * * Who went with you?
A. [The witness identified the Assistant State's Attorney who had participated in the entire trial.]
* * *
Q. And who else?
* * *
A. The other Assistant State's Attorney. (Apparently referring to the vacationing prosecutor).
* * *
Q. Whose office did you go into * * *?
A. [Identifying the office of the Assistant State's Attorney who had participated in the entire trial.]
Q. * * * And did you have a conversation with the Assistant State's Attorneys at that time?
A. They asked me some questions about—about the case.
Q. Exactly what did they ask you?
A. Like they was reviewing over it, Your Honor.
* * *
Q. Reviewing over again?
A. Yes, you know, asking me explain over again what happened.
* * *
Q. Did [they] tell you * * * what you were going to * * * [testify to on] Monday?
A. No."

The court addressed the prosecutor who had participated in the entire trial and who had discussed the testimony with the complainant.

"The Court: [W]hat do you want to tell the Court?

[Prosecutor]: It happened this way. I asked her if she had been nervous. She said she had. I said, *"Let's review what you have said,"* and then I told her to come back Monday.

The Court: What was the purpose of reviewing what was said?

[Prosecutor]: She was just very nervous. I was trying to calm her down. I was telling her that she did very well, but I asked her, are you nervous— I said, "Were you nervous on the stand?" And she said yes, she was.

The Court: *But you reviewed the whole testimony that she gave. What's the purpose of that when a witness is on the stand?*

[Prosecutor]: *We were just talking about it just to calm her down.*

The Court: I'm going to declare a mistrial. Motion allowed, mistrial. Let the record reflect when we met here yesterday [the substitute prosecutor] informed the Court that all he said to the complaining witness was that he was going to be the attorney and—

[Prosecutor]: That's all I said.

The Court: But the record will indicate that there was a long conversation by [the other] Assistant State's Attorney * * * who was in the midst of a trial taking a witness downstairs and reviewing all of the evidence and because of that the Court is declaring a mistrial.

[Defense Counsel]: That you, Your Honor." (Emphasis added.)

Subsequently, a second bench trial was held before Judge Robert L. Massey. Each of the defendants was found guilty of the rape of the complainant and each was sentenced to a term of imprisonment. As will be noted later, at the second trial before the able and experienced jurist, the double jeopardy issue was not raised nor was any reference made to it.

The defendants appeal.

OPINION

I

The defendants contend that their initial prosecution ended in a mistrial due to "prosecutorial overreaching," and that any reprosecution of them violates the double jeopardy clause of the United States Constitution.[1]

---

[1] "No person * * * shall * * * be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend V.

■■ As evidence was presented and received, there is no dispute that jeopardy had attached when the mistrial was declared at the defendants' first trial. (*Serfass v. United States* (1975), 420 U.S. 377, 388, 43 L. Ed. 2d 265, 274, 95 S. Ct. 1055, 1062.) However, to conclude that jeopardy attached prior to a mistrial declaration "begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial." (*Illinois v. Somerville* (1973), 410 U.S. 458, 467, 35 L. Ed. 2d 425, 433, 93 S. Ct. 1066, 1071.) We must now determine whether, under the facts of this particular case, the State's reprosecution of the defendants placed them "twice" in jeopardy for the same offense.

■■ The prohibition against double jeopardy, made applicable to the States through the fourteenth amendment (*Benton v. Maryland* (1969), 395 U.S. 784, 23 L. Ed. 2d 707, 89 S. Ct. 2056), is "one of the oldest ideas found in western civilization" (*Bartkus v. Illinois* (1959), 359 U.S. 121, 151, 3 L. Ed. 2d 684, 706, 79 S. Ct. 676, 696 (Black, J., dissenting)). Although the primary purpose of the double jeopardy clause is to preserve the integrity of final judgments (*Crist v. Bretz* (1978), 437 U.S. 28, 33, 57 L. Ed. 2d 24, 29-30, 98 S. Ct. 2156, 2159), it also protects a defendant's separate but related interest in avoiding multiple prosecutions where his initial trial is aborted before a final determination of guilt or innocence can be made (*United States v. Scott* (1978), 437 U.S. 82, 92, 57 L. Ed. 2d 65, 74-75, 98 S. Ct. 2187, 2194).

If the first trial is not completed, a second prosecution may be grossly unfair. "It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing" (*Arizona v. Washington* (1978), 434 U.S. 497, 503-04, 54 L. Ed. 2d 717, 727, 98 S. Ct. 824, 829), and enhances "the possibility that even though innocent he may be found guilty" (*Green v. United States* (1957), 355 U.S. 184, 188, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223).

This does not mean, however, that every time a trial fails to end in a final judgment, the accused is entitled to go free. A defendant's valued right to have his fate determined by the original tribunal "must [sometimes] be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter* (1949), 336 U.S. 684, 689, 93 L. Ed. 974, 978, 69 S. Ct. 834, 837.

■■ If, after jeopardy has attached, a mistrial is declared at the prosecutor's request, or by the trial judge *sua sponte*, retrial ordinarily will not be barred if there was a "manifest necessity" for the act. (*Arizona v. Washington* (1978), 434 U.S. 497, 54 L. Ed. 2d 717, 98 S. Ct. 824.) Manifest necessity is usually found where, due to circumstances beyond the control of the parties and the court, it becomes no longer possible to conduct the

trial,[2] or no longer possible to reach a fair result based upon the evidence.[3] However, manifest necessity has also been found where an impartial verdict could not be reached because of prosecutorial or judicial error (see, *e.g., Himmelfarb v. United States* (9th Cir. 1949), 175 F.2d 924 (the district attorney, in the presence of the jury, referred to another criminal case pending against the defendant); *United States v. Giles* (W.D. Okla. 1937), 19 F. Supp. 1009 (prejudicial remarks by the trial judge))[4] and where an impartial verdict *could* have been reached but a procedural error by the prosecutor made reversal on appeal a certainty (*Illinois v. Somerville* (1973), 410 U.S. 458, 35 L. Ed. 2d 425, 93 S. Ct. 1066 (jurisdictional defect in the indictment that could not be cured by amendment or waiver)).

If the mistrial declaration is not requested by the prosecutor, or entered by the trial judge *sua sponte*, but, rather, is requested by the defendant and made with his consent, ordinarily there is no barrier to reprosecution. This is true "even if the defendant's motion [for a mistrial] is necessitated by prosecutorial or judicial error." (*United States v. Jorn* (1971), 400 U.S. 470, 485, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 557 (plurality opinion).) "Such a motion * * * is deemed to be a deliberate election on [the defendant's] part to forego his valued right to have his guilt or innocence determined before the first trier of fact." *United States v. Scott* (1978), 437 U.S. 82, 57 L. Ed. 2d 65, 76, 98 S. Ct. 2187, 2189.[5]

---

[2] For example, manifest necessity has been found where the judge, defendant or a juror became ill during trial and could not proceed. *United States v. Lynch* (D.D.C. 1978), 467 F. Supp. 575; *United States v. Stein* (S.D.N.Y. 1956), 140 F. Supp. 761; *United States v. Potash* (2d Cir. 1941), 118 F.2d 54; *Gardes v. United States* (5th Cir. 1898), 87 F. 172. But see *Dunkerley v. Hogan* (2d Cir. 1978), 579 F.2d 141, *cert. denied* (1979), ___ U.S. ___, 59 L. Ed. 2d 56, 99 S. Ct. 872.

[3] Manifest necessity has been found when it was discovered during the course of the trial that a juror was biased against one of the parties (*Simmons v. United States* (1891), 142 U.S. 148, 35 L. Ed. 968, 12 S. Ct. 171) or had served on the grand jury which indicted the defendant (*Thompson v. United States* (1894), 155 U.S. 271, 39 L. Ed 146, 15 S. Ct. 73). The classic basis for a mistrial is a deadlocked jury. *United States v. Sanford* (1976), 429 U.S. 14, 50 L. Ed. 2d 17, 97 S. Ct. 20; see *Arizona v. Washington* (1978), 434 U.S. 497, 509-510, 54 L. Ed. 2d 717, 730, 98 S. Ct. 824, 832.

[4] See also *United States v. Romano* (5th Cir. 1973), 482 F.2d 1183, *cert. denied*, 414 U.S. 1129, 38 L. Ed. 2d 753, 94 S. Ct. 866 (improper opening remarks); *United States v. Beasley* (5th Cir. 1973), 479 F.2d 1124, *cert. denied*, 414 U.S. 924, 38 L. Ed. 2d 158, 94 S. Ct. 252 (improper questioning); *White v. State* (Alas. 1974), 523 P.2d 428 (same); *City of Tucson v. Valencia* (1973), 21 Ariz. App. 148, 517 P.2d 106 (prosecutor failed to instruct witness not to testify about another charge pending against the defendant); *People ex rel. Mosley v. Carey* (1979), 74 Ill. 2d 527, 387 N.E.2d 325 (assistant prosecutor furnished information concerning the trial to a reporter who subsequently published an article which could have prejudiced the jury if they saw or read it).

[5] In view of the prosecutorial or judicial error involved, the accused may choose to continue on with the original trial hoping to end the dispute then and there with an acquittal (*United States v. Jorn* (1971), 400 U.S. 470, 484, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 557), or he may move for a mistrial believing "that a continuation of the tainted proceeding would [simply] result in a conviction followed by a lengthy appeal, and, if a reversal is secured, by

As indicated, if the manifest necessity or the defendant's request for a mistrial is precipitated by prosecutorial or judicial *error*, retrial is permissible. Because of the complexities and dynamics of the trial itself; some prosecutorial or judicial error will inevitably occur in a significant number of cases. To preclude reprosecution whenever such error results in a mistrial would exact too high a price for the defendant's interest in finality and accord too little weight to society's vital interest in the enforcement of criminal laws. As Justice Harlan stated in *United States v. Jorn* (1971), 400 U.S. 470, 483-84, 27 L. Ed. 2d 543, 556, 91 S. Ct. 547, 556:

"Certainly * * * the Double Jeopardy Clause does not guarantee a defendant that the Government will be prepared, in all circumstances, to vindicate the social interest in law enforcement through the vehicle of a single proceeding for a given offense. Thus, for example, reprosecution for the same offense is permitted where the defendant wins a reversal on appeal of a conviction. *United States v. Ball*, 163 U.S. 662 (1896); see *Green v. United States*, 355 U.S. 184, 189 (1957). The determination to allow reprosecution in these circumstances reflects the judgment that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." See also *United States v. Tateo* (1964), 377 U.S. 463, 466, 12 L. Ed. 2d 448, 451, 84 S. Ct. 1587, 1589.

However, if the manifest necessity or the defendant's request for a mistrial is attributable not to prosecutorial or judicial error, but, rather to prosecutorial or judicial *overreaching*, retrial is forbidden. *United States v. Martin* (8th Cir. 1977), 561 F.2d 135; *United States v. Kessler* (5th Cir. 1976), 530 F.2d 1246; *United States v. Broderick* (S.D. Fla. 1977), 425 F. Supp. 93.

Overreaching is typically defined as prosecutorial or judicial misconduct: (1) which is specifically designed to provoke a mistrial in order to secure a second—and perhaps more favorable—opportunity to convict the accused (see *United States v. Dinitz* (1976), 424 U.S. 600, 611, 47 L. Ed. 2d 267, 276, 96 S. Ct. 1075, 1081; *Drayton v. Hayes* (2d Cir. 1979), 589 F.2d 117); or (2) which is motivated by bad faith or undertaken to harass or prejudice the accused (see *Lee v. United States* (1977), 432 U.S. 23, 32-34, 53 L. Ed. 2d 80, 89, 97 S. Ct. 2141, 2147; *United States v. Martin* (8th Cir. 1977), 561 F.2d 135).

---

a second prosecution" (*United States v. Dinitz* (1976), 424 U.S. 600, 608, 47 L. Ed. 2d 267, 274, 96 S. Ct. 1075, 1080). The important consideration is that the defendant retain primary control over the course to be followed. *United States v. Dinitz* (1976), 424 U.S. 600, 609, 47 L. Ed. 2d 267, 275, 96 S. Ct. 1075, 1080.

■■ In contrast to prosecutorial or judicial error, overreaching is not an inevitable part of the trial process and cannot be condoned. Rather, it signals a breakdown in the integrity of the judicial proceeding. When a trial is tainted by overreaching and ends in a mistrial, the defendant's interest in finality overrides society's interest in law enforcement, and reprosecution is barred regardless of whether the mistrial was granted at the defendant's request (see, *e.g., United States v. Kessler* (5th Cir. 1976), 530 F.2d 1246), or on the initiative of the prosecutor or the trial judge (see *United States v. Wilson* (6th Cir. 1976), 534 F.2d 76, 79 n. 5).

Consequently, it is unnecessary for us to determine in this case if the mistrial was granted at the defendants' request or with their consent. (See generally Annot., 63 A.L.R.2d 782 (1959); *People v. Bean* (1975), 26 Ill. App. 3d 1090, 325 N.E.2d 679, *aff'd on other grounds* (1976), 64 Ill. 2d 123, 355 N.E.2d 17.) The only issue we need to resolve is whether the assistant state's attorney's conduct at the first trial, which precipitated the mistrial declaration, constituted overreaching and thus acts as a bar to the defendants' reprosecution.

The State and the defendants assume that the assistant state's attorney's conference with the complainant—during a recess in the first trial and while the complainant was still subject to cross-examination— was improper. However, the State and the defendants disagree whether this misconduct constitutes prosecutorial overreaching.

■■ It is not improper for an attorney to refresh a witness' memory *before he takes the stand*. Reviewing testimony with a witness makes for better direct examination, facilitates the trial and lessens the possibility of irrelevant and perhaps prejudicial interpolations. (See 3 Wigmore, Evidence §788 (Chadbourn rev. 1970).) The attorney must be careful, however, to respect "the important ethical distinction between discussing testimony and seeking improperly to influence it." *Geders v. United States* (1976), 425 U.S. 80, 90 n. 3, 47 L. Ed. 2d 592, 600 n.3, 96 S. Ct. 1330, 1336 n. 3.

As a general rule, an attorney may also consult with a witness, regarding his testimony, even after the witness is placed on the stand, *provided* a legitimate need arises for such a discussion. (See 23 C.J.S. *Criminal Law* §1025 (1961).)[6] The attorney, for example, may require

---

[6] We note parenthetically, that it is unclear, at the present time, if the trial court has the authority to prohibit or limit an attorney's discussion of the case with his witness, when a recess is declared while the witness is on the stand and is still subject to examination. (*Cf. People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96, *Geders v. United States* (1976), 425 U.S. 80, 96 S. Ct. 1330, 47 L. Ed. 2d 592, and *Thompson v. Atlantic Building Corp.* (D.C. Cir. 1954), 107 A.2d 784 with *Stocker Hinge Mfg. Co. v. Darnel Industries, Inc.* (1978), 61 Ill. App. 3d 636, 377 N.E.2d 1125 and *State v. Learner* (1973), 112 R.I. 62, 308 A.2d 324 (and cases cited therein).) The above situation should be contrasted with that presented in *People v. Lewis* (1977), 53 Ill. App. 3d 89, 368 N.E.2d 619 (during the State's cross-examination of the accused, defense counsel requested a recess to consult with his client).

additional information made relevant by the days' testimony, or he may find it necessary to inquire along lines not fully explored earlier. However, since such discussions (after a witness has taken the stand and is still subject to examination) pose a tantalizing potential for misconduct, they are to be strictly scrutinized.

There is no question that when the weekend recess was declared at the defendants' first trial—while the complainant was on the stand and subject to further cross-examination—the prosecution's case was going badly. The assistant state's attorney was acutely aware that, based upon Friday's testimony, the State may have failed to prove a *prima facie* case against a number of the defendants because of the complainant's complete and often times disastrous inability to identify her alleged attackers. Immediately after the weekend recess was declared on Friday, the assistant state's attorney took the complainant into an office and proceeded to "review and discuss" with her the testimony she had previously given that day. When the trial reconvened on Monday, the complainant positively, conclusively and unhesitatingly identified the defendants as the men who had allegedly raped her.

Since the complainant's positive identification testimony on Monday appeared to be a drastic change from her uncertain identification testimony the previous Friday, both defense counsel and the trial judge attempted to ascertain whether any of the State's Attorneys had met with the complainant, over the weekend recess, to discuss her testimony. While the assistant state's attorney was never specifically asked whether such a conference had taken place on Friday, we believe the tenor of the inquiries necessitated and should have prompted the assistant state's attorney's disclosure to the court of her Friday afternoon conference with the complainant.

The assistant state's attorney, however, stood mute. She allowed her co-counsel (who had just entered the case that weekend and was apparently unaware of the Friday afternoon conference) to make repeated representations to the court which, at the very least, implied that no one from the State's Attorney's office had met with the complainant over the weekend recess to discuss her testimony. It was not until the trial judge had placed the complainant on the stand and questioned her that the assistant state's attorney's lengthy conference with the complainant came to light.

There was no legitimate need for the assistant state's attorney to meet with the complainant and to intensively review and discuss the complainant's previous testimony. We reject the State's claim that such a conference was necessary to calm the complainant down. There were other less suspect ways available to relieve the complainant of her nervousness; ways which would not have posed such an inviting potential for prosecutorial manipulation.

■ It would be futile to attempt to evaluate whether the assistant state's attorney intended to or did in fact manipulate the complainant's testimony by means of this conference. (See *Illinois v. Somerville* (1973), 410 U.S. 458, 482-83 n. 1, 35 L. Ed. 2d 425, 442 n. 1, 93 S. Ct. 1066, 1079 n. 1 (Marshall, J., dissenting).) Nevertheless, it is imperative that testimonial communication represent, so far as possible, the sincere expression of the witness' own recollection and observation. Any and all forms of prosecutorial misconduct which realistically *appear* to deprive a witness' testimony of this fundamental quality must be forbidden.

■ Consequently, we find that based upon the facts of this particular case, the assistant state's attorney's misconduct in holding the conference, coupled with her tacit attempt to conceal it and the possibility that prejudicial harm may have resulted therefrom, warrants a finding of overreaching. It would be offensive to the constitutional guaranty against successive, oppressive prosecutions, if the State, at a trial in which its case was going badly, could, by such misconduct, precipitate a mistrial and thereby gain another more favorable opportunity to convict the accused.[7]

Furthermore, the record on appeal compels the inference that the assistant state's attorney's misconduct was motivated by bad faith. It apparently resulted from a fear that (based upon the testimony elicited from the complainant on Friday) the trial judge was likely to acquit a number of the defendants. (See *United States v. Jorn* (1971), 400 U.S. 470, 485 n. 12, 27 L. Ed. 2d 543, 556 n.12, 91 S. Ct. 547, 557 n.12.) Although the attorney for the sovereign must prosecute with earnestness and vigor, (s)he must still be faithful to society's overriding interest that justice be done. (*United States v. Agurs* (1976), 427 U.S. 97, 110-11, 49 L. Ed. 2d 342, 354, 96 S. Ct. 2392, 2401.) As the United States Supreme Court stated in *Berger v. United States* (1935), 295 U.S. 78, 88, 79 L. Ed. 1314, 1321, 55 S. Ct. 629, 633:

> "The [government attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to

---

[7] In *Carsey v. United States* (D. C. App. 1967), 392 F.2d 810, 813-814, Judge Leventhal described how subtle changes in the State's testimony, initially favorable to the defendant, may occur during the course of successive prosecutions:

"[T]he Government witnesses came to drop from their testimony impressions favorable to defendant. Thus a key prosecution witness, the last person to see appellant and the deceased together, who began by testifying that they had acted that evening like newlyweds on a honeymoon, without an unfriendly word spoken, ended up by saying for the first time in four trials that the words between them had been 'firm,' and possibly harsh and 'cross.'

We also note that the police officer who readily acquiesced in the two 'hung jury' trials that appellant was 'hysterical,' later withheld that characterization. This shift, though less dramatic, was by no means inconsequential in view of the significance of appellant's condition at the time he made a statement inconsistent with what he later told another officer."

govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." See also ABA Standards, The Prosecution Function §1.1(c) (1971).

We find that the prosecutorial misconduct at the defendants' first trial, which precipitated the mistrial declaration, constituted overreaching and acts as a bar to the defendants' reprosecution.

## II

The State contends that by failing to raise the double-jeopardy issue below, either prior to or during the course of the second trial, the defendants have waived it for purposes of appeal. This is indeed the general rule. *People v. Scales* (1960), 18 Ill. 2d 283, 164 N.E.2d 76; *People v. Szudy* (1978), 56 Ill. App. 3d 494, 371 N.E.2d 1222; *United States v. Perez* (2d Cir. 1977), 565 F.2d 1227; see generally *Waiver of Double Jeopardy Right: The Impact of* Jeffers v. United States, 14 Wake Forest L. Rev. 842 (1978).

■■ However, because of the seriousness of the double jeopardy issue in this case, and its intimate relationship to the integrity and fairness of our judicial proceedings, we have elected to consider it as plain error under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)). (See *People v. Godsey* (1978), 74 Ill. 2d 64, 383 N.E.2d 988; *cf. People v. Gallas* (1966), 77 Ill. App. 2d 132, 221 N.E.2d 782.) In so doing, we instill life into the words of the Connecticut Supreme Court:

"Integrity is the very breath of justice. Confidence in our law, our courts, and in the administration of justice is our supreme interest. No practice must be permitted which invites towards the administration of justice a doubt or distrust of its integrity." *Erwin M. Jennings Co. v. DiGenova* (1928), 107 Conn. 491, 499, 141 A. 866, 868.

## III

Finally, we feel compelled to point out that the decisional process in this case was extremely troublesome in view of the heinous nature of the alleged crime involved. Rape is one of the most brutal acts one human being can inflict upon another. "It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim * * *. Short of homicide, it is the

'ultimate violation of self.'" *Coker v. Georgia* (1977), 433 U.S. 584, 597-98, 53 L. Ed. 2d 982, 992-93, 97 S. Ct. 2861, 2868.

Nevertheless, no matter how reprehensible a particular offense may be, it remains our obligation to turn back the State's encroachment upon the constitutional rights of its citizens. The attainment of justice oftentimes compels a difficult accommodation among conflicting societal interests. And as the Supreme Court of the United States noted: "[T]he right not to be placed in jeopardy more than once for the same offense is a vital safeguard in our society, one that was dearly won and one that should continue to be highly valued. If such great constitutional protections are given a narrow, grudging application they [will be] deprived of much of their significance." *Green v. United States* (1957), 355 U.S. 184, 198, 2 L. Ed. 2d 199, 210, 78 S. Ct. 221, 229.

Accordingly, for the reasons stated, we conclude that the defendants' constitutional right not to be placed twice in jeopardy for the same offense has been violated. We, therefore, reverse the convictions of the defendants and direct that each of the indictments be dismissed.

Reversed.

JOHNSON and ROMITI, JJ., concur.