No. 2-18-0091
Opinion filed August 2, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF JESSICA MILNE, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-D-1179 |
| | ) | |
| DAVID MILNE, | ) | Honorable |
| | ) | Elizabeth M. Rochford, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    In this interlocutory appeal under Illinois Supreme Court Rule 306(a) (eff. Nov. 1, 2017), respondent David Milne appeals from the trial court's denial of his motion to dismiss petitioner Jessica Milne's petition for dissolution of the parties' marriage. David argues that (1) the trial court erred in determining that Illinois is the parties' children's home state under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/101 *et seq.* (West 2016)), (2) he was deprived of due process when the court temporarily allocated parental responsibilities to Jessica without notice and an opportunity to be heard, and (3) Jessica's unclean hands precluded a remedy in her favor. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    The parties were married in Lake County on July 3, 2014.  David is a Canadian citizen and attended college in the United States under several visas.  Jessica, a United States citizen, had a child from a previous marriage (M.N.M., born in July 2009), whom David adopted in July 2014.  The parties initially lived in and rented a house in Lake County, and M.N.M. attended preschool there from 2011 through August 2015.

¶ 4    In June 2015, Jessica applied for permanent residency in Canada for herself and M.N.M.  Also that month, the parties purchased a home in East Gwillimbury (Newmarket), Ontario.  In July 2015, in Lake County, the parties had a second child (L.T.M.), who has dual citizenship.[1]

¶ 5    In August 2015, the parties relocated to Canada, and David worked as a hockey referee and as an agent for Allstate.  Jessica began work as a sales representative for Beauty Counter, and M.N.M. was enrolled in first grade.  The parties moved their assets to Canada and opened bank accounts there.  In December 2015, Jessica's and M.N.M.'s applications for permanent residency in Canada were approved, and they were granted permanent residency in February 2016.  They received Ontario health care cards and social insurance numbers.  Also, L.T.M. received an Ontario health care card (as a natural born child of a Canadian citizen).

¶ 6                    A. 2016 Dissolution Petition and Consent Order

¶ 7    On July 31, 2016, the parties and their children traveled from Ontario to Lake Forest, Illinois.  They had purchased tickets for all of them to return to Canada on August 14, 2016.  However, while in Lake County, Jessica informed David that she and the children would not return to Canada and, on August 22, 2016, she petitioned for dissolution of the parties' marriage

---

[1] The trial court found that L.T.M. was born in November 2014.  This appears to be incorrect but has no bearing on our analysis.

(case No. 16-D-1536). David returned to Canada, and, on September 7, 2016, he petitioned in the Northern District of Illinois to return the children to Canada (case No. 1:16-cv-8716).

¶ 8   On November 2, 2016, a consent order was entered in the federal case.[2]   The parties, who were each represented by counsel, agreed that the children "shall return *on a temporary basis* to Ontario, Canada" (emphasis added), with the parties within two days before the start of school in January 2017.  Both parties "shall accompany the minor children back" to their home in Ontario, and the children shall reside there "*until the beginning of July 2018*, and the [parties] shall have equal access to the minor children."  (Emphasis added.)  David agreed to vacate the home, unless Jessica obtained a new residence, and the parties agreed to participate in marriage counseling in Canada, starting in January 2017.  Also, the order provided that, "*by agreement of the parties, the children's habitual residence is the United States of America*."  (Emphasis added.)  The parties agreed that Jessica could "take reasonable vacations and holidays" to the United States with the children and that, upon the children's return to Canada, Jessica "shall promptly file a notice" in the federal court that the children have returned.  Further, "upon the filing of [Jessica's] notice[,] this matter shall be DISMISSED WITH PREJUDICE," and Jessica will dismiss with prejudice, by November 9, 2016, any claims filed in Lake County.  David agreed to dismiss with prejudice by the same date all claims filed in the Superior Court of Justice in Ontario.

_____

[2] The order specifies that it was entered pursuant to article 7c of the 1980 Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq.* (Supp. II 2015), along with the parties' express consent and agreement.

¶ 9     The consent order further provided that Jessica would support David's application to become a permanent resident of the United States.  The parties also agreed that David "shall not have sexual relations with any third parties from the entry of" the order "through the period of the *temporary* relocation to Canada."  (Emphasis added.)  If he did have such sexual relations, Jessica "shall be permitted to return to Illinois immediately with the minor children."  Finally, the order provided that it was "not a determination of the merits of any custody issues within the meaning of Article 19 of the Hague Convention."

¶ 10    Between July 2016 and January 2017, Jessica and the children remained in Lake County, and then they returned to Canada.  On November 8, 2016, Jessica's dissolution petition was voluntarily dismissed.

¶ 11                          B. 2017 Dissolution Petition

¶ 12    On July 11, 2017, while Jessica and the children were in Lake County for a two-week vacation (according to David), Jessica petitioned there for dissolution of the marriage.  David was served in Canada on July 14, 2017, and Jessica returned to Canada with the children on July 20, 2017.

¶ 13    On August 11, 2017, David moved to strike and dismiss the dissolution petition for lack of jurisdiction or *forum non conveniens*.  735 ILCS 5/2-619(a)(9) (West 2016).  He asserted that Illinois was not the children's home state under the UCCJEA and that the court had no personal jurisdiction over him because he had no contact with Illinois except for Jessica's temporary presence in the state.  He also asserted that Jessica could not meet the residency requirements of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/101 *et seq.* (West 2016)).  Finally, David asserted that the court should decline to exercise jurisdiction,

based on the doctrine of *forum non conveniens*, because the parties, their children, and their assets were in Canada, not Lake County.

¶ 14    On September 18, 2017, David filed an application for dissolution of marriage in Canada, and Jessica was served.

¶ 15    On January 9, 2018, the trial court conducted a hearing on the motion to strike and dismiss, consisting solely of the attorneys' arguments, and it took the matter under advisement and set it for ruling on January 30, 2018.

¶ 16    On January 12, 2018, Jessica filed in Lake County an emergency motion for temporary jurisdiction and to enforce the November 2, 2016, consent order, permitting her to return to Illinois (due to David's alleged violation of the infidelity provision[3]).  Jessica asserted that she reasonably feared that David would seek to have the children returned to Canada and that, if she and the children returned to Canada, David would not allow them to return to Illinois despite the consent order's terms.  The trial court entered an accelerated briefing schedule and it accelerated its ruling to January 18, 2018.  On January 16, 2018, Jessica also filed in Lake County a verified petition for a temporary restraining order and/or a preliminary injunction, enjoining David from seeking the children's return during the trial court's home-state determination.

¶ 17    On January 17, 2018, David filed in Lake County an emergency motion for the immediate return of the children to Canada and for other relief, asserting that Jessica had withheld parenting time and had absconded to Illinois with the children on January 10, 2018.  He noted that the parties had lived in Ontario since August 2015 with the exception of five months in 2016 after Jessica filed her first dissolution petition.

---

[3] She alleged that she attached to her motion an "investigative report of Haywood Hunt & Associates dated January 9, 2018."  The report is not contained in the record on appeal.

¶ 18    On January 18, 2018, after a pretrial hearing with counsel (but no evidentiary hearing), the trial court issued its ruling on the pending matters. The court ruled that, based on the totality of the facts and circumstances and considering the consent order, the children's presence in Canada was temporary and their home state under the UCCJEA was Illinois. It specifically found that, although the consent order's habitual-residence provision was not conclusive on the home-state issue, it "cannot be ignored." Habitual residence, the court noted, "goes to establishing a last shared intent of the parties," but it is not the same as the home state. Further, strict physical presence was not the sole consideration for the home-state determination. Rather, the court "must consider whether and to what extent there was a temporary absence," a factual determination. The court found that the consent order "confirmed the [United States] as the children's habitual residence, but also clarified the return to Canada as temporary." The court noted that, "in determining the nature of the absence from Illinois," it placed great weight on the consent order's use of the term "temporary." The court rejected David's argument that the consent order's failure to include language addressing the home state was fatal to Jessica's argument. The court determined that the fact that lack of such language did not limit the court's ability to consider the language that was included in the consent order. "This Court rejects the argument that these minor children have lost their roots in Illinois, established their identity in Canada[,] and that a return to Illinois would be damaging and not in their best interests because there is no evidence to support it." It further found that it had personal jurisdiction over David on the bases that he engaged in conduct that resulted in the conception of a child in Illinois and that he entered into a contract (*i.e.*, the consent order) in Illinois.

¶ 19    In its written order, the court first denied David's motion to strike and dismiss Jessica's dissolution petition, finding that Illinois had asserted jurisdiction pursuant to the UCCJEA and

that the court had personal jurisdiction over David. Second, the court ordered that M.N.M. be immediately enrolled in school in Lake County and that David be entitled to parenting time there every other weekend. It also ordered Jessica to transport the children to Canada during all three-day United States holiday weekends and that David have the weekend immediately following the end of the school year, the first week immediately thereafter, and the week of spring break. It also ordered that each party may Skype or FaceTime with the children while they are in the other's care, every day by 8 p.m. for up to 20 minutes. Third, the court denied both parties' emergency motions for temporary jurisdiction and it noted that Jessica's verified petition for a temporary restraining order and/or a preliminary injunction was resolved elsewhere in its ruling.

¶ 20 Jessica moved to clarify the trial court's order concerning parenting time and to set parenting-exchange parameters. On February 15, 2018, the trial court clarified certain aspects of the parties' parenting time and set exchange parameters. David subsequently petitioned for leave to appeal to this court (Ill. S. Ct. R. 306(a)(5) (eff. Nov. 1, 2017)), and on February 22, 2018, we granted his petition.

¶ 21                                  II. ANALYSIS

¶ 22 David argues that (1) the trial court erred in determining that Illinois is the parties' children's home state under the UCCJEA, (2) he was deprived of due process when the court temporarily allocated parental responsibilities to Jessica without notice and an opportunity to be heard, and (3) Jessica's unclean hands precluded a remedy in her favor. He requests that we reverse the trial court's determination that Illinois is the children's home state or, alternatively, deem that Illinois should decline to exercise jurisdiction. David also requests that, because he was denied due process, we vacate the trial court's January 18, 2018, order with respect to the

children and we order that they be returned to Canada on a date certain. For the following reasons, we reject his arguments.[4]

¶ 23                                    A. Home State

¶ 24    David argues first that the trial court erred in finding that Illinois is the children's home state. He asserts that, for the six months preceding the filing of Jessica's dissolution petition (*i.e.*, January to July 2017), the children resided entirely in Canada. David contends that the objective facts in the record (not the parties' subjective intent), including the consent order, reflect that Jessica moved to Canada shortly after the birth of L.T.M. (in August 2015) and filed for (and was granted) permanent residency there. The parties bought a home in Canada and moved their bank accounts and furniture there, and Jessica and M.N.M. received social insurance numbers and Ontario health care cards. Further, both David and Jessica obtained employment in Canada, Jessica received child tax benefits there, M.N.M. attended Canadian schools, and the

---

[4] We also decline David's request to strike Jessica's statement of additional facts, which, he asserts, contains argument and misstates the record, thereby violating Illinois Supreme Court Rule 341(h)(6) (eff. July 1, 2017). When an appellant's brief improperly includes argument, conclusions, or inappropriate record citations, we may, in our discretion, strike those portions of the brief. *Hubert v. Consolidated Medical Laboratories*, 306 Ill. App. 3d 1118, 1120 (1999). However, where the violations are not "so flagrant as to hinder or preclude review," striking a brief in whole or in part may be "unwarranted." (Internal quotation marks omitted.) *Id.* Here, to the extent that Jessica's statement of additional facts is improperly argumentative or provides improper citations, it is nevertheless not so misleading as to hinder our analysis. The properly asserted facts are sufficient to permit our review of this appeal. We will not strike the statement of additional facts, but we will simply disregard any portions that we believe violate Rule 341.

children saw Canadian healthcare providers. Even after the consent order (in November 2016), David notes, Jessica returned to Canada with the children, leased property there, and resided there. Thus, according to David, before Jessica commenced court proceedings (in his view, they were commenced in August 2016 when Jessica filed her first dissolution petition), the parties' intent was to leave the United States and permanently reside in Canada. David notes that, although in the consent order the parties agreed that the children's "habitual residence" was the United States, they never defined their "home state." The "habitual residence" designation was for purposes of resolving David's petition for the children's return. The reference to Illinois in the consent order relates only to the infidelity provision. He proposes that the trial court should have looked back to the parties' last prelitigation action, namely, when they moved to Canada in 2015 and (allegedly) intended to permanently locate there. Further, in David's view, the parties and the children were required to reside in Canada until at least July 2018. The trial court, he urges, should have determined that Ontario was the children's home state and declined to exercise UCCJEA jurisdiction. For the following reasons, we reject David's arguments.

¶ 25    We review *de novo* questions of statutory construction, as well as a trial court's ruling on a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure. *Fleckles v. Diamond*, 2015 IL App (2d) 141229, ¶ 30.

¶ 26    Turning first, for context, to the Hague Convention, we note that it is not intended to settle custody disputes but is designed to ensure that such disputes are presumptively litigated in the child's country of habitual residence. *Ortiz v. Martinez*, 789 F.3d 722, 728 (7th Cir. 2015). The Seventh Circuit has explained:

   " 'The Hague Convention is an anti-abduction treaty.' *Redmond v. Redmond*, 724 F.3d 729, 739 (7th Cir.[ ]2013). It was designed 'to deter parents from absconding with their

children and crossing international borders in the hopes of obtaining a favorable custody determination in a friendlier jurisdiction.' *Walker v. Walker*, 701 F.3d 1110, 1116 (7th Cir.[ ]2012). To this end, the Convention employs a 'remedy of return,' *Khan v. Fatima*, 680 F.3d 781, 783 (7th Cir.[ ]2012) (internal quotation marks omitted), which 'entitles a person whose child has wrongfully been removed to the United States in violation of the Convention to petition for return of the child to the child's country of "habitual residence," ' [*Norinder v. Fuentes*, 657 F.3d 526, 529 (7th Cir. 2011)]. A court's role in enforcing the Convention is not to settle a custody dispute between the parties, 'but rather to restore the status quo prior to any wrongful removal or retention.' *Redmond*, 724 F.3d at 739." *Id.* The Hague Convention does not define "habitual residence," and courts have "understood the inquiry to be a 'practical, flexible, factual' one that 'accounts for all available relevant evidence and considers the individual circumstances of each case.' " *Martinez v. Cahue*, 826 F.3d 983, 989-90 (7th Cir. 2016) (quoting *Redmond v. Redmond*, 724 F.3d 729, 732 (2013)). The focus is on the place where the child has made a home and "identifies the country whose courts should be entrusted with determinations such as custody and support." *Id.* at 990. The two most important factors are parental intent and the child's acclimatization to the proposed home jurisdiction. *Id.*

¶ 27 The UCCJEA, in turn, which is at issue here and became effective in Illinois on January 1, 2004, " 'was promulgated to end custody jurisdictional disputes between states, to promote cooperation between states in determining custody issues, and to enhance the ability of states to enforce custody orders expeditiously.' " *Fleckles*, 2015 IL App (2d) 141229, ¶ 32 (quoting *In re Joseph V.D.*, 373 Ill. App. 3d 559, 561 (2007)). Once a state makes an initial child custody determination, the statute gives the state exclusive continuing jurisdiction. *Id.*; see 750 ILCS

36/202(a) (West 2016). "As used in the [UCCJEA], *** 'jurisdiction' must be understood as simply a procedural limit on when the court may hear initial custody matters, not a precondition to the exercise of the court's inherent authority," which "emanates solely from article VI, section 9, of our constitution (Ill. Const. 1970, art. VI, § 9)." *McCormick v. Robertson*, 2015 IL 118230, ¶ 27.

¶ 28    Section 201 of the UCCJEA states, in part:

"(a) Except as otherwise provided in Section 204 [*i.e.*, temporary emergency jurisdiction], a court of this State has jurisdiction to make an initial child-custody determination only if:

(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under Section 207 or 208, and:

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under Section 207 or 208; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3).

(b) Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this State.

(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination." 750 ILCS 36/201 (West 2016).

¶ 29    Section 102(7) of the UCCJEA contains the definition of "home state":

" 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. *A period of temporary absence of any of the mentioned persons is part of the period.*" (Emphasis added.) *Id.* § 102(7).

The statute defines "Commencement" as "the filing of the first pleading in a proceeding." *Id.* § 102(5). It also treats a foreign country as a "state." *Id.* § 105(a).

¶ 30    The UCCJEA does not define "temporary absence," but the comment to section 102 of the uniform act states that "[t]he definition of 'home State' has been reworded slightly. No substantive change is intended from the [Uniform Child Custody Jurisdiction Act (UCCJA) (the

prior uniform act) (750 ILCS 35/1 *et seq.* (West 2002), repealed by Pub. Act 93-108, § 404 (eff. Jan. 1, 2004))].” Uniform Child Custody Jurisdiction and Enforcement Act § 102 cmt. (Nat’l Conf. of Comm’rs on Unif. State Laws 1997), http://www.uniformlaws. org/shared/docs/child_custody_jurisdiction/uccjea_final_97.pdf. Thus, we find helpful case law interpreting the prior uniform act.

¶ 31    Illinois cases that have addressed temporary absences under the UCCJA are split on the proper analysis. The First, Third, and Fifth Districts adopted a totality-of-the-circumstances approach. See *Richardson v. Richardson*, 255 Ill. App. 3d 1099, 1102-04 (1993) (Third District case under prior uniform act; rejecting the strict physical-presence test because an agreement for extended out-of-state visits under that scenario “would be discouraged because of the potential legal consequences to the custodial parent” and “such agreements should be encouraged as a matter of public policy”; noting that absence intended to last a limited time can be temporary absence regardless of length of time; to determine whether a state is the home state, court must examine child’s physical presence in the state and “under what circumstances the child came to and remained in the State”; holding that 11-month consensual visit to Illinois did not establish home-state jurisdiction); see also *In re Marriage of Howard*, 291 Ill. App. 3d 675, 681 (1997) (Fifth District case under prior uniform act; following *Richardson* and holding that a temporary absence can be many months; court must examine circumstances under which the child came to reside in the state); *In re Parentage of Frost*, 289 Ill. App. 3d 95, 102-04 (1997) (First District case under prior uniform act; adopting *Richardson*’s approach to allow a court to consider the parents’ agreement and intent in determining whether a child’s out-of-state absence was temporary; holding that trial court on remand may consider parties’ agreement and intent in determining whether out-of-state visit of greater than six months was sufficient to confer home-

state jurisdiction in that state).  The Fourth District, in contrast, adopted a strict physical-presence test.  See *In re Marriage of Schoeffel*, 268 Ill. App. 3d 839, 842-43 (1994) (under prior uniform act, rejecting the relevance of a parent's intent to the temporary-absence issue; noting error in incorporating nuances of the concept of "domicile" into the definition of home state; stating that "whether a State is a child's 'home state' is primarily a question of time": specifically, "where has the child lived with a person acting as a parent for the last six months?"; noting that it is "a mistake to allow parties to make agreements [that] control the operation of the Act"; only absences of less than six months within the relevant six-month period can be temporary; nine-month stay in New York was not temporary); see also *In re Marriage of Arulpragasam*, 304 Ill. App. 3d 139, 148-49 (1999) (Fourth District case under prior uniform act; following *Schoeffel* and applying strict physical-presence test).

¶ 32    The *Frost* court addressed the conflict within the districts of the appellate court, noting that the strict physical-presence test was likely "propelled more as a matter of policy preference than as a matter of literal or contextual statutory compulsion."  *Frost*, 289 Ill. App. 3d at 101. The statute does not define "temporary absence," and the strict physical-presence test, the court noted, discourages agreements between parties and can result in certain inequities.  *Id.* at 101-02. "The freedom to reach such agreements should not be hampered by fear that jurisdiction would vest in another state if the out-of-state absence extends beyond six months.  Any such fear would have a chilling effect on the formation of any such agreements, and family bonds would suffer." *Id.* at 102.  The court adopted the *Richardson* analysis "because it encourages settlement of visitation issues and because it offers protection when the promise to return the child is breached either because it was falsely made at the outset or because the parent decides at a later time not to return the child." *Id.*

¶ 33    We follow *Richardson*.  We agree with *Frost* that agreements concerning custody should be encouraged and that a strict reading of the statutory six-month period can lead to harsh results, thereby discouraging family ties.  We also agree with *Richardson* and the other cases that hold that a temporary absence is not limited to a period of six months or less.  Such a limit, again, can lead to harsh results, most significantly in cases where a child temporarily moves to another state to attend school, which, in most cases, encompasses nine months.  *Richardson* presented such a scenario and is otherwise factually analogous to this case.   In *Richardson*, a California dissolution judgment awarded the parties joint custody of their daughter and further provided that her primary residence would be with her father in California.  The mother then moved to Illinois, and, under a written agreement between the parties, the father allowed the daughter to go to Illinois to live with her mother in order to attend fifth grade the following school year.  While the child lived in Illinois, the father moved to Arizona.  Pursuant to the agreement, the child was returned to the father at the end of the school year and continued to reside with him.  The mother then sought to enroll the California dissolution judgment in Illinois, and the father asserted that Illinois lacked jurisdiction.  The trial court dismissed the case.  On appeal, the Third District affirmed, holding that, when the child came to Illinois, the parties' understanding was that she would not remain in Illinois; her 11-month stay here was a temporary absence from California. *Richardson*, 255 Ill. App. 3d at 1102-04 (rejecting the strict physical-presence test and the concurring opinion's position that a temporary absence cannot exceed six months).

¶ 34    This case presents similar facts. Jessica filed her dissolution petition on July 11, 2017, in Lake County.  David's assertion that the proceedings commenced at an earlier time is incorrect because the first dissolution petition was dismissed with prejudice pursuant to the consent order. Jessica and the children had returned to Canada in January 2017 and the parties remained there

- 15 -

until she filed her second petition. Thus, they physically resided in Canada during the relevant six-month period (January to July 2017). Turning to the nature of the parties' Canadian residence during that period, the consent order memorialized their shared intent that their Canadian residence was temporary and would last only until July 2018. Any intent otherwise prior to the consent order is irrelevant because the order superseded it. Further, there is no evidence that, after the order, the parties changed their intent that their residence would be temporary.

¶ 35 David maintains that the trial court applied the "totality of the circumstances" test incorrectly, where it considered solely the consent order rather than *objective* evidence that the parties' move to Canada in August 2015 was intended to be permanent. He points again to the fact that the parties purchased real estate in Canada, moved their belongings there, applied for and received permanent residency for Jessica and the children, paid taxes in Canada, and relocated their bank accounts there. Also, David notes that L.T.M. has essentially spent his entire life in Canada and that M.N.M., by the parties' agreement, was to attend Canadian schools for first through third grades. Finally, David notes that the trial court did not consider that the parties were already involved in litigation in Lake County and Canada when the consent order was entered. In his view, the trial court, which cited no case deeming an extended absence temporary, erroneously relied on the fact that Jessica was free to leave Canada and return to Illinois should David violate the consent order. He points out that the consent order required that Jessica remain in Canada and keep the children enrolled in school there until at least July 2018 and did not mention where Jessica or the children should reside thereafter.

¶ 36 We disagree with David's contention that the trial court focused exclusively on the consent order. This assertion is clearly belied by the court's explicit finding that the consent

order's habitual-residence provision was not conclusive but was merely a relevant consideration. The court also stated that the habitual residence "goes to establishing the shared intent of the parties" but was not the same as the home state. The court determined that the consent order "clarified that the return to Canada [was] temporary." The order further provided that the children would reside in Canada "until the beginning of July 2018" and that Jessica would support David's application to become a permanent resident of the United States. The order specified that it was not a custody determination, and the court did not err in interpreting its terms for purposes of ascertaining the parties' intent. David's suggestion that the court should have looked further back in time, specifically to 2015, to find that their move to Canada was permanent is not well taken. Even if that were their intent then, the parties later, in the consent order, memorialized their (changed) intent that the return to Canada was temporary. We also reject David's argument that the three-year absence from Illinois was too long to constitute a temporary absence under any reading of the UCCJEA. *Richardson* and the cases that follow it reject this view. Again, the question is the parties' intent and the objective circumstances during the relevant period, January to July 2017. One indication of the parties' intent was their agreement in the consent order that the children "shall return on a *temporary* basis to Ontario Canada" with the parties in January 2017, that the children would reside in Ontario "until the beginning of July 2018," and that Jessica would support David's application for permanent residency in the United States. Nothing occurred afterward to reflect that the parties agreed that their Canadian residency would be anything other than temporary. We also find David's reliance on foreign cases to be misplaced, because they do not involve written agreements concerning the parties' temporary residence. See *Baxter v. Baxter*, 2015-0085 (La. App. 4 Cir. 6/24/15); 171 So. 3d 1159; *Chick v. Chick*, 596 S.E.2d 303 (N.C. Ct. App. 2004).

¶ 37    We also reject David's argument that the trial court ignored substantial objective evidence that the parties' Canadian residency was intended to be permanent.  He notes that certain objective factors under the totality-of-the-circumstances test, such as driver's license registration, receipt of government benefits, payment of taxes, and home ownership, point to Ontario as the home state.  See Andrea Charlow, *There's No Place Like Home: Temporary Absences in the UCCJEA Home State*, 28 J. Am. Acad. Matrim. Law 25, 34-35(II)(B)(3) (2015) (noting that "[t]he 'totality of the circumstances' test is commonly used to determine if an absence is temporary" and that courts will consider the following: intent, duration, nature, and purpose of presence outside of state, applications for driver's licenses and public benefits, payment of taxes, home ownership or lease, school registration, presence as related to the receipt of medical care, and presence for parental educational or job opportunities).  We cannot quarrel with this general proposition.  However, here, the parties memorialized their intent in an objective piece of evidence, namely, the consent order.  Thus, under these circumstances, the trial court correctly placed the most significant weight on this objective factor.

¶ 38    We also find unavailing David's assertion that the trial court's ruling must be reversed because the court failed to conduct an evidentiary hearing.  In our view, the trial court correctly found that "[t]he facts are generally undisputed" and that, therefore, no hearing was required.  *Cf. Frost*, 289 Ill. App. 3d at 103 ("an evidentiary hearing must be held to determine whether the parties had agreed that Michael would return to Illinois at the conclusion of his visit to California and whether the petitioner knew more than six months before he filed his petition that Michael's residence in California was permanent").

¶ 39    Because we conclude that Illinois is the children's home state, we need not reach David's alternative argument that, even if Canada is not the children's home state, Illinois is not their

home state either and the trial court should have declined to exercise jurisdiction after conducting a proper statutory analysis. See 750 ILCS 36/201(a)(2) (West 2016) (Illinois has jurisdiction where a court of another state does not have jurisdiction and the child and at least one parent have a significant connection to Illinois other than mere physical presence and there is substantial evidence in Illinois concerning the child's care, protection, training, and personal relationships).

¶ 40                                    B. Due Process

¶ 41    Next, David argues that he was denied due process, where the trial court, *sua sponte* and without a hearing, temporarily allocated parental responsibilities to Jessica. He concedes that the trial court did not rule on Jessica's emergency motion to enforce the consent order, but he contends that its ruling *essentially* granted her every part of the relief she sought in that motion. *Implicit* in its ruling, David argues, was that Jessica was allowed to remain in Illinois with the children, choose the school in which to enroll L.T.M., and make all daily decisions concerning the children's care, and that David's parenting time (as compared to the "equal access" he enjoyed under the consent order) was dramatically reduced. He maintains that the trial court enforced a clause barred by public policy and stripped David of his parental rights without notice and a hearing. See 750 ILCS 5/603.5(a) (West 2016) (a temporary allocation of parental responsibilities "shall be made in accordance with the standards set forth in Sections 602.5 and 602.7 [of the Dissolution Act]: (i) after a hearing"); see also *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶¶ 24-25 (deferential standard applies to findings concerning allocation of parental responsibilities); *In re Marriage of Heindl*, 2014 IL App (2d) 130198, ¶ 21 (due process violation presents legal question, subject to *de novo* review). David requests that we vacate the January 18, 2018, order and that the children be returned to Canada.

¶ 42    Jessica responds that David's constitutional rights were not violated by the court's temporary allocation of parental responsibilities and setting of a temporary parenting-time schedule, where his parental rights remain intact and the court simply acted to ensure a reasonable status quo for the short term. On the last point, she notes that the transcript of the January 18, 2018, hearing reflects that the court, "*sua sponte* without prejudice pending resolution of any appeals," simply ensured that M.N.M. would attend school and that David would have regular parenting time in both Illinois and Canada. The court also, Jessica notes, set a very prompt status date, for less than six weeks hence. Thus, contrary to David's claims, the court did not make any substantive custody determinations. We agree with Jessica and find no error with the court's order maintaining the status quo pending appeal. The transcript of the January 18, 2018, hearing reflects that David suggested imposing a stay on any substantive issues pending appeal. The court then ordered that M.N.M. be immediately enrolled in the school she had previously attended, noting that the order would be without prejudice and temporary. The court further noted that it was "extremely concerned about parenting time for David while this litigation is pending and during the course of the appeal, so I will be entering a specific order in regard to [a] parenting time schedule for David." David did not object or request a hearing. Next, Jessica requested that the order allow her to enroll L.T.M. in preschool, so long as she provided David with prior notice, and the court agreed. David voiced no objection.

¶ 43    David next focuses on the consent-order clause that allows Jessica to leave Canada if David has sexual relations with a third party. He argues that the clause is against public policy and unenforceable. Thus, in his view, Jessica's removal of herself and the children without notice violated the consent order. Jessica responds first that the trial court did not grant her

emergency motion and did not even hear the motion on January 18, 2018; the motion was merely discussed in a pretrial conference. Thus, she reasons, because the court did not enforce the infidelity provision in the consent order, David cannot now claim that his due process rights were violated. Second, she contends that, even if the infidelity provision is properly before this court, the provision is not against public policy. She notes that the consent order does not grant her custody upon David's infidelity, but, rather, allows an earlier return to Illinois than the previously agreed-to July 2018 return date.

¶ 44 We reject David's argument. Contrary to his assertion, the trial court made no findings concerning the infidelity clause, and we need not reach it. Further, we find unavailing his argument that the only means by which the trial court could have determined on January 18, 2018, that Jessica should remain in Illinois was by determining that the infidelity clause had been violated. The trial court's findings (on David's motion to dismiss for lack of UCCJEA jurisdiction) were based on its analysis of home-state jurisdiction; it did not rule on the infidelity clause.

¶ 45                    C. Unclean Hands

¶ 46 David's final argument is that, due to Jessica's unclean hands in removing the children from Canada, this court should vacate the trial court's order asserting jurisdiction over the children. He asserts that Jessica provided false itineraries during the winter holiday, claiming that she would return the children to Canada in January 2018. In fact, he urges, she was seeking to gain advantage in the Lake County litigation. The trial court, he asserts, failed to consider Jessica's bad faith in absconding with the children.

¶ 47 "In Illinois, misconduct on the part of a plaintiff that will defeat recovery in a court of equity under the doctrine of unclean hands must have been conduct in connection with the very

transaction being considered or complained of and must have been misconduct, fraud[,] or bad faith toward the defendant making the contention. [Citation.] The doctrine is not a judicial strait-jacket that will prevent a court of equity from doing justice[,] and its application is not favored by the courts." *Paul L. Pratt, P.C. v. Blunt*, 140 Ill. App. 3d 512, 521-22 (1986). Application of the doctrine is within the trial court's discretion. *La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.*, 249 Ill. App. 3d 415, 437 (1993).

¶ 48 We reject David's argument. He asserts that Jessica was due to return to Canada from Florida with the children on January 7, 2018, but, instead, texted him from Lake Forest on January 10, 2018, to ask if his attorneys had received her emergency motion filed that day. In our view, the trial court could have reasonably declined to invoke the unclean-hands doctrine. David's position is that Jessica returned to Illinois with the children in order to establish jurisdiction for the dissolution petition that she had filed here. We agree that this is the type of conduct that the statute is designed to prevent. Even so, Jessica alleged in her emergency motion for temporary jurisdiction that David violated the consent order's infidelity provision, which, if true, would have allowed her to immediately return to Illinois. Although we do not reach the issues of the provision's validity or the truthfulness of Jessica's allegation, we believe that the court could have reasonably declined to find that she had unclean hands where she asserted a potentially valid reason for returning to Illinois.

¶ 49                                III. CONCLUSION

¶ 50 For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 51 Affirmed.